# EXHIBIT A

4/10/2017 2:20:43 PN
Chris Daniel - District Clerk Harris Count'
Envelope No. 1636997'
By: Jelilat Adesiyar
Filed: 4/10/2017 2:20:43 PN

# 2017-24250 / Court: 270

CAUSE NO. _____

| | | |
|---|---|---|
| BRIAR CAPITAL L.P., | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| VS. | § | HARRIS COUNTY, TEXAS |
| | § | |
| THE HANOVER INSURANCE COMPANY, | § | |
| Defendant. | § | _____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

Briar Capital L.P. ("Briar") files this original petition against The Hanover Insurance Company ("Hanover").

### Discovery control plan

1.     Plaintiff elects discovery control plan level 2 under Tex. R. Civ. P. 190.3.

### Rule 47 statement

2.     Pursuant to Tex. R. Civ. P. 47, Plaintiff seeks monetary relief against Hanover over $1,000,000.  Plaintiff reserves and does not waive additional claims it might bring.

### Parties

3.     Briar Capital, L.P., is a Texas limited partnership that conducts business in Harris County, Texas.

4.     The Hanover Insurance Company is a New Hampshire corporation licensed to conduct business of insurance in Texas that may be served through its registered agent in Texas, CT Corp System, at 1999 Bryan Street, Suite 900, Dallas Texas 75201-3136.

### Jurisdiction and venue

5.     This Court has personal jurisdiction over Hanover because it conducts business in Texas and has continuous and systematic contacts with Texas.  This Court has subject matter jurisdiction over this claim because the amount in controversy exceeds the jurisdictional minimum

of this Court.

6.      Venue for this lawsuit is proper in Harris County, Texas, under Tex. Civ. Prac. & Rem. Code §§15.002(a)(1) and 15.032.

**Facts**

7.      Briar is an insured under the Hanover Insurance Company Financial Institution Bond number BFD1045523, effective for the bond period of December 20, 2015 to December 20, 2016 (the "Bond"). A true and correct copy of the Bond is attached as Exhibit A.

8.      On May 8, 2012, Forward Components, Inc. ("Forward") and Briar entered into the Sale of Accounts and Security Agreement (the "Security Agreement"). A true and correct copy of the Security Agreement is Exhibit B.

9.      Pursuant to the Security Agreement, Forward agreed to sell and Briar agreed to purchase certain Accounts[1] pursuant to the terms and conditions, and based on the representations and warranties, in the Security Agreement.

10.     The Security Agreement was signed by Scott Wilkosz as President of Forward. Each of the representations and warranties in the Security Agreement was made by Forward and by Scott Wilkosz, individually, as well as by each of Forward's principals, officers, managers, members, and partners. *See* Section 4, Exhibit B.

11.     As security for Forward's obligations under the Security Agreement, Forward granted to Briar a security interest in and lien upon all of Forward's right, title, and interest in and to the Collateral. The Security Agreement defines the Collateral as follows:

> "Collateral" means and includes all of [Forward's] right, title, and interest in and to each of the following, wherever located and whether now or hereafter existing or now owned or hereafter acquired or rising: Accounts; Chattel Paper; Commercial Tort

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Security Agreement.

> Claims; Deposit Accounts; Documents; Equipment; General Intangibles; Goods (including but not limited to all files, correspondence, computer programs, tapes, discs, and related data-processing software which contains information identifying or pertaining to any of the Collateral or any Account Debtor or showing the amounts thereof or payments thereon or otherwise necessary or helpful in the realization thereon or the collection thereof); Inventory; Proceeds of Inventory; Investments; Letters of Credit and Letter of Credit Rights; and all Supporting Obligations. All the above whether now or hereafter acquired.

*See* Exhibit "1.1," Exhibit B. A true and correct copy of the UCC Financing Statement for the Collateral is Exhibit C.

12. The Accounts purchased by Briar from Forward constituted alleged purchase orders and invoices by and to several units and subsidiaries of Honeywell International, Inc. ("Honeywell"). The Security Agreement defines Accounts as follows:

> "Account(s)" includes a right to payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of or (ii) for services rendered or to be rendered."

*See* Exhibit "1.1" of Exhibit B.

13. All Accounts purchased by Briar from Forward were listed on a Schedule of Accounts Sold/Bill of Sale (the "Schedule(s)"). The Accounts were purchased by Briar in good faith and in reliance on the validity of the Accounts, and the Honeywell invoices and purchase orders.

14. Each Schedule lists Forward under "client's name." The Schedules include a date, a schedule number, the name of the account debtors, the invoice numbers, invoice dates, invoice amounts, and are signed by Scott Wilkosz as President of Forward. Each Schedule includes an assignment transferring to Briar Forward's interest in the Accounts. These assignments are made pursuant to provisions in the Security Agreement and incorporate all warranties made in the

-3-

Security Agreement.

15.     In 2016, Briar investigated a series of late or missing payments by Honeywell on the Accounts identified in the Schedules. Briar employees and agents conducted a field examination and had meetings and telephone conferences with Forward's officers and employees. Initially, in those meetings and telephone conferences, Forward's officers and employees, including Scott Wilkosz, represented that the Accounts from Honeywell were just and true and due and provided excuses and explanations for why Honeywell was delaying payment of such Accounts.

16.     Briar was provided by Forward with the name of a contact at Honeywell with whom to verify the Accounts. Another Honeywell representative informed Briar that none of the Accounts were just and true or genuine, and that Honeywell did not issue such purchase orders to Forward; *i.e.,* the Accounts were counterfeits and forgeries.

17.     Briar's officers and employees then confronted Scott Wilkosz with this information and Scott Wilkosz admitted that all of the Honeywell Accounts were fraudulent and did not exist.

18.     Briar was unaware that it was purchasing forged, altered, and counterfeit accounts from Forward. On November 2, 2016, Scott Wilkosz admitted that Forward forged, altered, and counterfeited the purchase orders and sold to Briar non-existent invoices. The forged, altered, and fraudulent Accounts, purchase orders, and invoices purchased from Forward totaled the sum of $905,456.08, which is the amount advanced by Briar to Forward.

19.     The Bond includes several Insuring Agreements contemplating various covered losses. Briar claims coverage under each and every section of the Bond that applies to these facts. Hanover has failed and refused to state which coverages apply, even though coverage is clear. By way of example only, Insuring Agreement (E) of the Bond states, in relevant part:

-4-

(E) Loss resulting directly from the Insured having, in good faith,
for its own account or for the account of others,
   (1) acquired, sold or delivered, or given value, extended credit
   or assumed liability, on the faith of, any original
     (b) Document of Title,
     . . .
     (e) Evidence of Debt,
     . . .
     (g) Security Agreement
which
        (ii) bears a signature of any maker, drawer, issuer,
        endorser, assignor, lessee, transfer agent, registrar,
        acceptor, surety, guarantor, or of any person signing in
        any other capacity which is a Forgery, or
        (ii) is altered
   (2) acquired, sold or delivered, or given value, extended credit
   or assumed liability, on the faith of any item listed in (a) through
   (d) which is a Counterfeit

20.     Counterfeit is defined in the Bond as "an imitation which is intended to deceive and

to be taken as the original." *See* page 3, Exhibit A.

21.     Document of Title is defined in the Bond as "a bill of lading, dock warrant, dock

receipt, warehouse receipt or order for the delivery of goods, and also any other document which

in the regular course of business or financing is treated as adequately evidencing that the person

in possession of it is entitled to receive, hold and dispose of the document and the goods it covers

and must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's

possession which are identified or are fungible portions of an identified mass." *See* page 3, Exhibit

A.

22.     Evidence of Debt is defined in the Bond as "an instrument, including a Negotiable

Instrument, executed by a customer of the insured and held by the insured which in the regular

course of business is treated as evidencing the customer's debt to the insured." *See* page 3, Exhibit

A.

23.     Security Agreement is defined in the Bond as "an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation." *See* page 4, Exhibit A.

24.     Each of these, and other, provisions of the Bond, apply to Briar's claim. Briar reserves and does not waive, and hereby claims, coverage under each provision of the Bond that applies to the claim, whether mentioned specifically herein or not.

25.     Briar made a timely and proper claim with Hanover under the Bond on November 16, 2016. A true and correct copy of the Claims Summary is attached as Exhibit D. Later, Hanover required that Briar provide additional information and documents and to complete and submit to Hanover a Proof of Loss Form, which Briar filed with Hanover on February 9, 2017. A true and correct copy of the Proof of Loss form is attached as Exhibit E.

26.     Hanover has failed and refused to act in good faith to effectuate a prompt, fair and equitable settlement of the claims filed by Briar in which Hanover's liability is reasonably clear. Hanover has also failed and refused to affirm or deny coverage of a claim to Briar within a reasonable time.

27.     Hanover, through its attorney, admitted that Hanover determined that the claim was not covered by the Bond when Hanover received the notice of the claim on or about November 16, 2016. Hanover reached this conclusion even though it had conducted no investigation. Hanover continued to request documents and information from Briar even though it had already determined the claim was not covered.

### First cause of action
### Breach of contract

28.     Hanover has breached the Bond by failing and refusing to accept and pay Briar's Claim which was timely made and covered by the Bond. Briar seeks its damages caused by such

-6-

breaches, including but not limited to all direct, actual, incidental, consequential, economic, special, nominal, and general damages, plus costs of court, attorney's fees, and pre- and post-judgment interest.

**Second cause of action**
**Bad faith**

29.     There are insurance contracts between Briar and Hanover which create a duty of good faith and fair dealing. Hanover breached its duty when it denied or delayed approving and paying Briar's Claim when coverage was reasonably clear. Such breaches proximately caused damages to Briar. Briar seeks its damages caused by such breaches, including but not limited to all direct, actual, incidental, consequential, economic, special, nominal, and general damages, plus costs of court, attorney's fees, and pre- and post-judgment interest. Briar also seeks exemplary or punitive damages based on the fraudulent, malicious, intentional, or grossly negligent conduct of Hanover.

**Third cause of action**
**Violations of Texas Insurance Code, Chapter 541**

30.     Hanover has violated the Texas Insurance Code (the "Code") in its handling of this claim and by denying coverage. Briar and Hanover are persons under the Code. Hanover is engaged in acts or practices that violated the Code, the Texas Business & Commerce Code, or a tie-in provision of the Code. Briar relied on Hanover's acts and practices to its detriment and such acts or practices caused actual damages. Briar seeks its damages caused by such breaches, including but not limited to all direct, actual, incidental, consequential, economic, special, nominal, and general damages, plus costs of court, attorney's fees, and pre- and post-judgment interest. Briar also seeks additional damages under the statutes.

**Conclusion**

Briar Capital, L.P. requests that the Court grant judgment in its favor against The Hanover Insurance Company for its damages, attorney's fees, costs of court, pre- and post-judgment interest, exemplary and additional damages, and that the Court grant all other relief to which it is entitled.

Respectfully submitted,

**NATHAN SOMMERS JACOBS**
A Professional Corporation

By:   */s/ George R. Gibson*
        George R. Gibson
        Texas Bar No. 00793802
        Marvin D. Nathan
        Texas Bar No. 14817000
        David Overhuls
        Texas Bar No. 24082029
        2800 Post Oak Boulevard, 61st Floor
        Houston, Texas 77056-6102
        713.960.0303 - telephone
        713.892.4800 – fax
        ggibson@nathansommers.com
        mnathan@nathansommers.com
        doverhuls@nathansommers.com


**MICHAEL JAY KUPER**
A Professional Corporation
        Michael Jay Kuper
        Texas Bar No. 11765000
        2901 Via Fortuna Drive, Suite 500
        Austin, Texas 78746
        512-874-3895 phone
        713-892-4800 fax
        mkuper@kuperlawfirm.com

ATTORNEYS FOR BRIAR CAPITAL, LP

W:\Briar Capital\Forward Components, Inc 58918 16577\Kaufman Dolowich (Hanover Ins)\POP V5 Updated.

2017-24250 / Court: 270

**FINANCIAL INSTITUTION BOND**
Standard Form No. 15, Revised to June, 1990

**Bond No.** BFD1045523

THE HANOVER INSURANCE COMPANY
440 Lincoln Street
Worcester, MA  01653
(Herein called Underwriter)

## DECLARATIONS

**Item 1.** Name of Insured (herein called Insured): Briar Capital LP

Principal Address: 1500 City West Boulevard, Suite 560, Houston, TX 77042

**Item 2.** Bond Period: from 12:01 a.m. on   12/20/2015            to 12:01 a.m. on   12/20/2016
standard time.                      (MONTH, DAY, YEAR)                          (MONTH, DAY, YEAR)

**Item 3.** The Aggregate Liability of the Underwriter during the Bond Period shall be
$.

**Item 4.** Subject to Sections 4 and 11 hereof,
the Single Loss Limit of Liability is $ 1,500,000
and the Single Loss Deductible is $ 100,000

Provided, however, that if any amounts are inserted below opposite specified Insuring Agreements or Coverage, those amounts shall be controlling.  Any amount set forth below shall be part of and not in addition to amounts set forth above.  (If an Insuring Agreement or Coverage is to be deleted, insert "Not Covered.")

| Amount applicable to: | Single Loss Limit of Liability | Single Loss Deductible |
|---|---|---|
| Insuring Agreement (D) — FORGERY OR ALTERATION | $ 1,500,000 | $ 10,000 |
| Insuring Agreement (E) — SECURITIES | $ 1,500,000 | $ 10,000 |
| Optional Insuring Agreements and Coverages: | | |
| Computer Systems Fraud | $ 1,500,000 | $ 10,000 |
| Voice Initiated Transfer Fraud | $ 1,500,000 | $ 10,000 |
| Telefacsimilie Transfer Fraud | $ 1,500,000 | $ 10,000 |

If "Not Covered" is inserted above opposite any specified insuring Agreement or Coverage, such Insuring Agreement or Coverage and any other reference thereto in this bond shall be deemed to be deleted therefrom.

**Item 5** The liability of the Underwriter is subject to the terms of the following riders attached hereto:
SR6275, SR6145b, SR6196, SR6184, SR6195, 181-1230, THC-100

**Item 6** The Insured by the acceptance of this bond gives notice to the Underwriter terminating or canceling prior bond(s) or policy(ies) No.(s)
such termination or cancellation to be effective as of the time this bond becomes effective.

Signed, sealed and dated this day of, 11/25/2015

*Anne Pandolfe*

Attest: _____
Anne Pandolfe, Attorney-in-Fact

By: *Cheryl Palen*
_____
Cheryl Palen, Attorney-in-Fact

TSB 5867a

**EXHIBIT A**

Page 1 of 6

The Underwriter, in consideration of an ag.        . premium, and in reliance upon all statements, made ᵢ        rformation furnished to the Underwriter by the insured in applying for this bond, and subject to the Declarations, Insuring Agreements , General Agreements, Conditions and Limitations and other terms hereof, agrees to indemnify the Insured for:

## INSURING AGREEMENTS

### FIDELITY

(A)  Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.

Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:

(a)  to cause the Insured to sustain such loss; and
(b)  to obtain financial benefit for the Employee or another person or entity.

However, if some or all of the Insured's loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was in collusion with one or more parties to the transactions and has received, in connection therewith, a financial benefit with a value of at least $2,500.

As used throughout this Insuring Agreement, financial benefit does not include any employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.

### ON PREMISES

(B) (1)  Loss of Property resulting directly from

(a)  robbery,   burglary,   misplacement,   mysterious unexplainable disappearance and damage thereto or destruction thereof, or
(b)  common-law or statutory larceny, committed by a person present in an office of the Insured covered under this bond.

while the Property is lodged or deposited within

(i)  any of the Insured's offices covered under this bond, or
(ii)  offices of any financial institutions, or
(iii)  any premises where the Insured leases safe deposit boxes.

(2)  Loss of or damage to

(a)  furnishings, fixtures, supplies or equipment within an office of the Insured covered under this bond resulting directly from larceny or theft in, or by burglary or robbery of, such office, or attempt thereat, or by vandalism or malicious mischief, or
(b)  such office resulting from larceny or theft in, or by burglary or robbery of such office or attempt thereat, or to the interior of such office by vandalism or malicious mischief,

provided that

(i)  the Insured is the owner of such furnishings, fixtures, supplies, equipment, or office or is liable for such loss or damage, and
(ii)  the loss is not caused by fire.

### IN TRANSIT

(C)  Loss of Property resulting directly from robbery, common-law or statutory larceny, misplacement, mysterious unexplainable disappearance, being lost or made away with, and damage thereto or destruction thereof, while the Property is in transit anywhere in the custody of

(a)  a natural person acting as a messenger of the Insured (or another natural person acting as messenger or custodian during an emergency arising from the incapacity of the original messenger), or
(b)  a Transportation Company and being transported in an armored motor vehicle, or

(c)  a Transportation Company and being transported in a conveyance other than an armored motor vehicle provided that covered Property transported in such manner is limited to the following:

(i)  records, whether recorded in writing or electronically, and
(ii)  Certificated Securities issued in registered form and not endorsed, or with restrictive endorsements, and
(iii)  Negotiable Instruments not payable to bearer, or not endorsed, or with restrictive endorsements.

Coverage under this Insuring Agreement begins immediately upon the receipt of such Property by the natural person or Transportation Company and ends immediately upon delivery to the designated recipient or its agent.

### FORGERY OR ALTERATION

(D)  Loss resulting directly from Forgery or alteration of, on, or in any Negotiable Instruments (except registered or bearer obligations) made or drawn by or drawn upon the Insured, or made or drawn by one acting as agent of the Insured, or purporting to have been made as herein before set forth:

A mechanically reproduced facsimile signature is treated the same as a handwritten signature.

### SECURITIES

(E)  Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,

(1)  acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, any original

(a)  Certificated Security,
(b)  Document of Title,
(c)  deed, mortgage or other instrument conveying title to, or creating or discharging a lien upon, real property,
(d)  Certificate of Origin or Title,
(e)  Evidence of Debt,
(f)  corporate, partnership or personal Guarantee, or
(g)  Security Agreement

which

(i)  bears a signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety, guarantor, or of any person signing in any other capacity which is a Forgery, or
(ii)  is altered, or
(iii)  is lost or stolen;

(2)  acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of any item listed in (a) through (d) above which is a Counterfeit.

Actual physical possession of the items listed in (a) through (g) above by the Insured, is a condition precedent to the Insured's having relied on the faith of such items.

A mechanically reproduced facsimile signature is treated the same as a handwritten signature.

### COUNTERFEIT CURRENCY

(F)  Loss resulting directly from the receipt by the Insured, in good faith, of any Counterfeit Money of the United States of America, Canada or of any other country in which the Insured maintains a branch office

## GENERAL AGREEMENTS

### ADDITIONAL OFFICES OR EMPLOYEES - CONSOLIDATION, MERGER OR PURCHASE OF ASSETS - NOTICE

A.  If the Insured shall, while this bond is in force, establish any additional offices, other than by consolidation or merger with, or purchase or acquisition of assets or liabilities of, another institution, such offices shall be automatically covered hereunder from the date of such establishment without the requirement of notice to the Underwriter or the payment of additional premium for the remainder of the premium period.

If the Insured shall, while this bond is in force, consolidate or merge with, or purchase or acquire assets or liabilities of, another institution, the Insured shall not have such coverage as is afforded under this bond for loss which

(a)  has occurred or will occur in offices or premises, or

(b)  has been caused or will be caused by an employee or employees

of such institution, or

(c)  has arisen or will arise out of the assets or liabilities acquired by the Insured as a result of such consolidation, merger of purchase or acquisition of assets of liabilities unless the Insured shall

(i)  give the Underwriter written notice of the proposed consolidation, merger or purchase or acquisition of assets or liabilities prior to the proposed effective date of such action and

(ii)  obtain the written consent of the Underwriter to extend the coverage provided by this bond to such additional offices or premises, Employees and other exposures, and

The Underwriter, in consideration of an a____ ____d premium, and in reliance upon all statements, made ____ information furnished to the Underwriter by the Insured in applying for this bond, and subject to the Declarations, Insuring Agreements , General Agreements, Conditions and Limitations and other terms hereof, agrees to indemnify the Insured for:

## INSURING AGREEMENTS

### FIDELITY

(A) Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.

Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:

(a) to cause the Insured to sustain such loss; and

(b) to obtain financial benefit for the Employee or another person or entity.

However, if some or all of the Insured's loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was in collusion with one or more parties to the transactions and has received, in connection therewith, a financial benefit with a value of at least $2,500.

As used throughout this Insuring Agreement, financial benefit does not include any employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.

### ON PREMISES

(B) (1) Loss of Property resulting directly from

(a) robbery, burglary, misplacement, mysterious unexplainable disappearance and damage thereto or destruction thereof, or

(b) common-law or statutory larceny, committed by a person present in an office of the Insured covered under this bond,

while the Property is lodged or deposited within

(i) any of the Insured's offices covered under this bond, or

(ii) offices of any financial institutions, or

(iii) any premises where the Insured leases safe deposit boxes.

(2) Loss of or damage to

(a) furnishings, fixtures, supplies or equipment within an office of the Insured covered under this bond resulting directly from larceny or theft in, or by burglary or robbery of, such office, or attempt thereat, or by vandalism or malicious mischief, or

(b) such office resulting from larceny or theft in, or by burglary or robbery of such office or attempt thereat, or to the interior of such office by vandalism or malicious mischief,

provided that

(i) the Insured is the owner of such furnishings, fixtures, supplies, equipment, or office or is liable for such loss or damage, and

(ii) the loss is not caused by fire.

### IN TRANSIT

(C) Loss of Property resulting directly from robbery, common-law or statutory larceny, misplacement, mysterious unexplainable disappearance, being lost or made away with, and damage thereto or destruction thereof, while the Property is in transit anywhere in the custody of

(a) a natural person acting as a messenger of the Insured (or another natural person acting as messenger or custodian during an emergency arising from the incapacity of the original messenger), or

(b) a Transportation Company and being transported in an armored motor vehicle, or

(c) a Transportation Company and being transported in a conveyance other than an armored motor vehicle provided that covered Property transported in such manner is limited to the following:

(i) records, whether recorded in writing or electronically, and

(ii) Certificated Securities issued in registered form and not endorsed, or with restrictive endorsements, and

(iii) Negotiable Instruments not payable to bearer, or not endorsed, or with restrictive endorsements.

Coverage under this Insuring Agreement begins immediately upon the receipt of such Property by the natural person or Transportation Company and ends immediately upon delivery to the designated recipient or its agent.

### FORGERY OR ALTERATION

(D) Loss resulting directly from Forgery or alteration of, on, or in any Negotiable Instruments (except registered or bearer obligations) made or drawn by or drawn upon the Insured, or made or drawn by one acting as agent of the Insured, or purporting to have been made as herein before set forth;

A mechanically reproduced facsimile signature is treated the same as a handwritten signature.

### SECURITIES

(E) Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,

(1) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, any original

(a) Certificated Security,

(b) Document of Title,

(c) deed, mortgage or other instrument conveying title to, or creating or discharging a lien upon, real property,

(d) Certificate of Origin or Title,

(e) Evidence of Debt,

(f) corporate, partnership or personal Guarantee, or

(g) Security Agreement

which

(i) bears a signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety, guarantor, or of any person signing in any other capacity which is a Forgery, or

(ii) is altered, or

(iii) is lost or stolen;

(2) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of any item listed in (a) through (d) above which is a Counterfeit.

Actual physical possession of the items listed in (a) through (g) above by the Insured, is a condition precedent to the Insured's having relied on the faith of such items.

A mechanically reproduced facsimile signature is treated the same as a handwritten signature.

### COUNTERFEIT CURRENCY

(F) Loss resulting directly from the receipt by the Insured, in good faith, of any Counterfeit Money of the United States of America, Canada or of any other country in which the Insured maintains a branch office

## GENERAL AGREEMENTS

### ADDITIONAL OFFICES OR EMPLOYEES - CONSOLIDATION, MERGER OR PURCHASE OF ASSETS - NOTICE

A. If the Insured shall, while this bond is in force, establish any additional offices, other than by consolidation or merger with, or purchase or acquisition of assets or liabilities of, another institution, such offices shall be automatically covered hereunder from the date of such establishment without the requirement of notice to the Underwriter or the payment of additional premium for the remainder of the premium period.

If the Insured shall, while this bond is in force, consolidate or merge with, or purchase or acquire assets or liabilities of, another institution, the Insured shall not have such coverage as is afforded under this bond for loss which

(a) has occurred or will occur in offices or premises, or

(b) has been caused or will be caused by an employee or employees

of such institution, or

(c) has arisen or will arise out of the assets or liabilities acquired by the Insured as a result of such consolidation, merger of purchase or acquisition of assets of liabilities unless the Insured shall

(i) give the Underwriter written notice of the proposed consolidation, merger or purchase or acquisition of assets or liabilities prior to the proposed effective date of such action and

(ii) obtain the written consent of the Underwriter to extend the coverage provided by this bond to such additional offices or premises, Employees and other exposures, and

(iii) upon obtaining such consent, ⌒ to the Underwriter an additional premium.

#### CHANGE OF CONTROL - NOTICE

B. When the Insured learns of a change in control, it shall give written notice to the Underwriter.

As used in this General Agreement, control means the power to determine the management or policy of a controlling holding company or the Insured by virtue of voting-stock ownership. A change in ownership of voting-stock which results in direct or indirect ownership by a stockholder or an affiliated group of stockholders of ten percent (10%) or more of such stock shall be presumed to result in a change of control for the purpose of the required notice.

Failure to give the required notice shall result in termination of coverage for any loss involving a transferee, to be effective upon the date of stock transfer.

#### REPRESENTATION OF INSURED

C. The Insured represents that the information furnished in the application for this bond is complete, true and correct. Such application constitutes part of this bond.

Any misrepresentation, omission, concealment or incorrect statement of a material fact, in the application or otherwise, shall be grounds for the rescission of this bond.

#### JOINT INSURED

D. If two or more Insureds are covered under this bond, the first named Insured shall act for all Insureds. Payment by the Underwriter to the first named Insured of loss sustained by any Insured shall fully release the Underwriter on account of such loss. If the first named Insured ceases to be covered under this bond, the Insured next named shall thereafter be considered as the first named Insured. Knowledge possessed or discovery made by any Insured shall constitute knowledge or discovery by all Insureds for all purposes of this bond. The liability of the Underwriter for loss or losses sustained by all Insureds shall not exceed the amount for which the Underwriter would have been liable had all such loss or losses been sustained by one Insured

#### DEFINITIONS

Section 1. As used in this bond:

(a) Acceptance means a draft which the drawee has, by signature written thereon, engaged to honor as presented.

(b) Certificate of Deposit means an acknowledgment in writing by a financial institution of receipt of Money with an engagement to repay it.

(c) Certificate of Origin or Title means a document issued by a manufacturer of personal property or a governmental agency evidencing the ownership of the personal property and by which ownership is transferred.

(d) Certificated Security means a share, participation or other interest in property of or an enterprise of the issuer or an obligation of the issuer, which is:

    (1) represented by an instrument issued in bearer or registered form;

    (2) of a type commonly dealt in on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and

    (3) either one of a class or series or by its terms divisible into a class or series of shares, participations, interests or obligations.

(e) Counterfeit means an imitation which is intended to deceive and to be taken as the original.

(f) Document of Title means a bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers and must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.

(g) Employee means

    (1) an officer or other employee of the Insured, while employed in, at, or by any of the Insured's offices or premises covered hereunder, and a guest student pursuing studies or duties in any of said offices or premises;

    (2) a person provided by an employment contractor to perform employee duties for the Insured under the Insured's supervision at any of the Insured's offices or premises covered hereunder;

#### NOTICE OF LEGAL PROCEEDINGS AGAINST INSURED - ELECTION TO DEFEND

E. The Insured shall notify the Underwriter at the earliest practicable moment, not to exceed 30 days after notice thereof, of any legal proceeding brought to determine the Insured's liability for any loss, claim or damage which, if established, would constitute a collectible loss under this bond. Concurrently, the Insured shall furnish copies of all pleadings and pertinent papers to the Underwriter.

The Underwriter, at its sole option, may elect to conduct the defense of such legal proceeding, in whole or in part. The defense by the Underwriter shall be in the Insured's name through attorneys selected by the Underwriter. The Insured shall provide all reasonable information and assistance required by the Underwriter for such defense.

If the Underwriter elects to defend the Insured, in whole or in part, any judgment against the Insured on those counts or causes of action which the Underwriter defended on behalf of the Insured or any settlement in which the Underwriter participates and all attorneys' fees, costs and expenses incurred by the Underwriter in the defense of the litigation shall be a loss covered by this bond.

If the Insured does not give the notices required in subsection (a) of Section 5 of this bond and in the first paragraph of this General Agreement, or if the Underwriter elects not to defend any causes of action, neither a judgment against the Insured, nor a settlement of any legal proceeding by the Insured, shall determine the existence, extent or amount of coverage under this bond for loss sustained by the Insured, and the Underwriter shall not be liable for any attorneys' fees, costs and expenses incurred by the Insured.

With respect to this General Agreement, subsections (b) and (d) of Section 5 of this bond apply upon the entry of such judgment or the occurrence of such settlement instead of upon discovery of loss. In addition, the Insured must notify the Underwriter within 30 days after such judgment is entered against it or after the Insured settles such legal proceeding, and, subject to subsection (e) of Section 5, the Insured may not bring legal proceedings for the recovery of such loss after the expiration of 24 months from the date of such final judgment or settlement.

### CONDITIONS AND LIMITATIONS

    (3) an employee of an institution merged or consolidated with the Insured prior to the effective date of this bond; and

    (4) each natural person, partnership or corporation authorized by the Insured to perform services as data processor of checks or other accounting records of the Insured (not including preparation or modification of computer software or programs), herein called Processor. Each such Processor, and the partners, officers and employees of such Processor shall, collectively, be deemed to be one Employee for all the purposes of this bond, excepting, however, the second paragraph of Section 12.A Federal Reserve Bank or clearing house shall not be construed to be a processor.

(h) Evidence of Debt means an instrument, including a Negotiable Instrument, executed by a customer of the Insured and held by the Insured which in the regular course of business is treated as evidencing the customer's debt to the Insured.

(i) Forgery means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

(j) Guarantee means a written undertaking obligating the signer to pay the debt of another to the Insured or its assignee or to a financial institution from which the Insured has purchased participation in the debt, if the debt is not paid in accordance with its terms.

(k) Letter of Credit means an engagement in writing by a bank or other person made at the request of a customer that the bank or other person will honor drafts or other demands for payment upon compliance with the conditions specified in the Letter of Credit.

(l) Loan means all extensions of credit by the Insured and all transactions creating a creditor relationship in favor of the Insured and all transactions by which the Insured assumes an existing creditor relationship.

(m) Money means a medium of exchange in current use authorized or adopted by a domestic or foreign government as a part of its currency.

(n) Negotiable Instrument means any writing

    (1) signed by the maker or drawer; and

    (2) containing any unconditional promise or order to pay a sum certain in Money and no other promise, order, obligation or power given by the maker or drawer; and

(3) is payable on demand or at a ...nite time; and

(4) is payable to order or bearer.

(o) Property means Money, Certificated Securities, Negotiable Instruments, Certificates of Deposit, Documents of Title, Acceptances, Evidences of Debt, Security Agreements, Certificates of Origin or Title, Letters of Credit, insurance policies, abstracts of title, deeds and mortgages on real estate, revenue and other stamps, and books of account and other records whether recorded in writing or electronically.

(p) Security Agreement means an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation.

(q) Transportation Company means any organization which provided its own or leased vehicles for transportation or which provides freight forwarding or air express services.

EXCLUSIONS

Section 2. This bond does not cover:

(a) loss resulting directly or indirectly from forgery or alteration, except when covered under Insuring Agreements (A), (D), or (E);

(b) under Insuring Agreement (D), loss resulting from the forgery or alteration of or on a Negotiable Instrument issued by the Insured in reliance upon a forged or altered Evidence of Debt;

(c) loss due to riot or civil commotion outside the United States of America and Canada; or loss due to military, naval or usurped power, war or insurrection unless such loss occurs in transit in the circumstances recited in Insuring Agreement (C), and unless, when such transit was initiated, there was no knowledge of such riot, civil commotion, military, naval or usurped power, war or insurrection on the part of any person acting for the Insured in initiating such transit;

(d) loss resulting directly or indirectly from the effects of nuclear fission of fusion or radioactivity; provided, however, that this paragraph shall not apply to loss resulting from industrial uses of nuclear energy;

(e) loss resulting directly or indirectly from any acts of any director of the Insured other than one employed as a salaried, pensioned or elected official or an Employee of the Insured, except when performing acts coming within the scope of the usual duties of an Employee, or while acting as a member of any committee duly elected or appointed by resolution of the board of directors of the Insured to perform specific, as distinguished from general, directorial acts on behalf of the Insured;

(f) loss resulting directly or indirectly from the complete or partial nonpayment of, or default upon, any Loan or transaction involving the Insured as a lender or borrower, or extension of credit, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or Evidences of Debt, whether such Loan, transaction or extension was procured in good faith or through trick, artifice, fraud or false pretenses; except when covered under Insuring Agreements (A), (D) or (E);

(g) loss of Property while

(1) in the mail, or

(2) in the custody of any Transportation Company, unless covered under Insuring Agreement (C)

except when covered under Insuring Agreement (A);

(h) loss caused by an Employee, except when covered under Insuring Agreement (A) or when covered under Insuring Agreement (B) or (C) and resulting directly from misplacement, mysterious unexplainable disappearance or destruction of or damage to Property;

(i) loss resulting directly or indirectly from trading, with or without the knowledge of the Insured, whether or not represented by any indebtedness or balance shown to be due the Insured on any customer's account, actual or fictitious, and notwithstanding any act or omission on the part of any Employee in connection with any account relating to such trading, indebtedness, or balance, except when covered under Insuring Agreements (D) or (E);

(j) loss resulting directly or indirectly from the use or purported use of credit, debit, charge, access, convenience, identification or other cards;

(k) potential income, including but not limited to interest and dividends, not realized by the Insured;

(l) damages of any type for which the Insured is legally liable, except compensatory damages, but not multiples thereof, arising directly from a loss covered under this bond;

(m) loss through the surrender of Property away from an office of the Insured as a result of a threat

(1) to do bodily harm to any person, except loss of Property in transit in the custody of any person acting as messenger provided that when such transit was initiated there was no knowledge by the Insured of any such threat, or

(2) to ... .amage to the premises or property of the Insured, except when covered under Insuring Agreement (A);

(n) indirect or consequential loss of any nature;

(o) loss resulting from any violation by the Insured or by any Employee

(1) of law regulating (i) the issuance, purchase or sale of securities, (ii) securities transactions over security exchanges or over the counter market, (iii) investment companies, or (iv) investment advisers, or

(2) of any rule or regulation made pursuant to any such law,.

unless it is established by the Insured that the act or acts which caused the said loss involved fraudulent or dishonest conduct which would have caused a loss to the Insured in a similar amount in the absence of such laws, rules or regulations;

(p) loss resulting directly or indirectly from the failure of a financial or depository institution, or its receiver or liquidator, to pay or deliver, on demand of the Insured, funds or Property of the Insured held by it in any capacity, except when covered under Insuring Agreements (A) or (B)(1)(a);

(q) damages resulting from any civil, criminal or other legal proceeding in which the Insured is alleged to have engaged in racketeering activity except when the Insured establishes that the act or acts giving rise to such damages were committed by an Employee under circumstances which result directly in a loss to the Insured covered by Insuring Agreement (A). For the purposes of this exclusion, "racketeering activity" is defined in 18 United States Code 1961 et seq., as amended;

(r) loss resulting directly or indirectly from any dishonest or fraudulent act or acts committed by any non-Employee who is a securities, commodities, money, mortgage, real estate, loan, insurance, property management, investment banking broker, agent or other representative of the same general character;

(s) loss, or that part of any loss, as the case may be, the proof of which, either as to its factual existence or as to its amount, is dependent upon an inventory computation or a profit and loss computation;

(t) loss resulting directly or indirectly from counterfeiting, except when covered under Insuring Agreements (A), (E), or (F);

(u) all fees, costs and expenses incurred by the Insured

(1) in establishing the existence of or amount of loss covered under this bond, or

(2) as a party to any legal proceeding whether or not such legal proceeding exposes the Insured to loss covered by this bond.

DISCOVERY

Section 3. This bond applies to loss discovered by the Insured during the Bond Period. Discovery occurs when the Insured first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

Discovery also occurs when the Insured receives notice of an actual or potential claim in which it is alleged that the Insured is liable to a third party under circumstances which, if true, would constitute a loss under this bond.

LIMIT OF LIABILITY

Section 4.

Aggregate Limit of Liability

The Underwriter's total liability for all losses discovered during the Bond Period shown in Item 2 of the Declarations shall not exceed the Aggregate Limit of Liability shown in Item 3 of the Declarations. The Aggregate Limit of Liability shall be reduced by the amount of any payment made under the terms of this bond.

Upon exhaustion of the Aggregate Limit of Liability by such payments:

(a) The Underwriter shall have no further liability for loss or losses regardless of when discovered and whether or not previously reported to the Underwriter, and

(b) The Underwriter shall have no obligation under General Agreement E to continue the defense of the Insured, and upon notice by the Underwriter to the Insured that the Aggregate Limit of Liability has been exhausted, the Insured shall assume all responsibility for its defense at its own cost.

The Aggregate Limit of Liability shall not be increased or reinstated by any recovery made and applied in accordance with subsections (a), (b) and (c) of Section 7. In the event that a loss of Property is settled by the

Underwriter through the use of a lost instrument bond, such loss shall not reduce the Aggregate Limit of Liability.

### Single Loss Limit of Liability

Subject to the Aggregate Limit of Liability, the Underwriter's liability for each Single Loss shall not exceed the applicable Single Loss Limit of Liability shown in Item 4 of the Declarations. If a Single Loss is covered under more than one Insuring Agreement or Coverage, the maximum payable shall not exceed the largest applicable Single Loss Limit of Liability

### Single Loss Defined

Single Loss means all covered loss, including court costs and attorneys' fees incurred by the Underwriter under General Agreement E, resulting from

(a) any one act or series of related acts of burglary, robbery or attempt thereat, in which no Employee is implicated, or

(b) any one act or series of related unintentional or negligent acts or omissions on the part of any person (whether an Employee or not) resulting in damage to or destruction or misplacement of Property, or

(c) all acts or omissions other than those specified in (a) and (b) preceding, caused by any person (whether an Employee or not) or in which such person is implicated, or

(d) any one casualty or event not specified in (a), (b) or (c) preceding.

### NOTICE/PROOF - LEGAL PROCEEDINGS AGAINST UNDERWRITER

Section 5.

(a) At the earliest practicable moment, not to exceed 30 days, after discovery of loss, the Insured shall give the Underwriter notice thereof.

(b) Within 6 months after such discovery, the Insured shall furnish to the Underwriter proof of loss, duly sworn to, with full particulars.

(c) Lost Certificated Securities listed in a proof of loss shall be identified by certificate or bond numbers if such securities were issued therewith.

(d) Legal proceedings for the recovery of any loss hereunder shall not be brought prior to the expiration of 60 days after the original proof of loss is filed with the Underwriter or after the expiration of 24 months from the discovery of such loss.

(e) If any limitation embodied in this bond is prohibited by any law controlling the construction hereof, such limitation shall be deemed to be amended so as to equal the minimum period of limitation provided by such law.

(f) This bond affords coverage only in favor of the Insured. No suit, action or legal proceedings shall be brought hereunder by any one other than the named Insured.

### VALUATION

Section 6. Any loss of Money, or loss payable in Money, shall be paid, at the option of the Insured, in the Money of the country in which the loss was sustained or in the United States of America dollar equivalent thereof determined at the rate of exchange at the time of payment of such loss

### Securities

The Underwriter shall settle in kind its liability under this bond on account of a loss of any securities or, at the option of the Insured, shall pay to the Insured the cost of replacing such securities, determined by the market value thereof at the time of such settlement. In case of a loss of subscription, conversion or redemption privileges through the misplacement or loss of securities, the amount of such loss shall be the value of such privileges immediately preceding the expiration thereof, if such securities cannot be replaced or have no quoted market value, or is such privileges have no quoted market value, their value shall be determined by agreement or arbitration.

If the applicable coverage of this bond is subject to a Deductible Amount and/or is not sufficient in amount to indemnify the Insured in full for the loss of securities for which claim is made hereunder, the liability of the Underwriter under this bond is limited to the payment for, or the duplication of, so much of such securities as has a value equal to the amount of such applicable coverage.

### Books of Account and Other Records

In case of loss of, or damage to, any books of account or other records used by the Insured in its business, the Underwriter shall be liable under this bond only if such books or records are actually reproduced and then for not more than the cost of the blank books, blank pages or other material, less the cost of labor for the actual transcription or copying of data which shall have been furnished by the Insured in order to reproduce such books and other records.

### Property other than Money, Securities or Records

In case of loss of, or damage to, any Property other than Money, securities, books of account or other records, or damage covered under Insuring Agreement (B)(2), the Underwriter shall not be liable for more than the actual cash value of such Property, or of items covered under Insuring Agreement (B)(2). The Underwriter may, at its election, pay the actual cash value of, replace or repair such property. Disagreement between the Underwriter and the Insured as to the cash value or as to the adequacy of repair or replacement shall be resolved by arbitration.

### ASSIGNMENT - SUBROGATION - RECOVERY - COOPERATION

Section 7.

(a) In the event of payment under this bond, the Insured shall deliver, if so requested by the Underwriter, an assignment of such of the Insured's rights, title and interest and causes of action as it has against any person or entity to the extent of this loss payment.

(b) In the event of payment under this bond, the Underwriter shall be subrogated to all of the Insured's rights of recovery therefor against any person or entity to the extent of such payment.

(c) Recoveries, whether effected by the Underwriter or by the Insured, shall be applied net of the expense of such recovery first to the satisfaction of the Insured's loss which would otherwise have been paid but for the fact that it is in excess of either the Single or Aggregate Limit of Liability, secondly, to the Underwriter as reimbursement of amounts paid in settlement of the Insured's claim, and thirdly, to the Insured in satisfaction of any Deductible Amount. Recovery on account of loss of securities as set forth in the second paragraph of Section 6 or recovery from reinsurance and/or indemnity of the Underwriter shall not be deemed a recovery as used herein.

(d) Upon the Underwriter's request and at reasonable times and places designated by the Underwriter the Insured shall

(1) submit to examination by the Underwriter and subscribe to the same under oath; and

(2) produce for the Underwriter's examination all pertinent records; and

(3) cooperate with the Underwriter in all matters pertaining to the loss.

(e) The Insured shall execute all papers and render assistance to secure to the Underwriter the rights and causes of action provided for herein. The Insured shall do nothing after discovery of loss to prejudice such rights or causes of action.

### LIMIT OF LIABILITY UNDER THIS BOND AND PRIOR INSURANCE

Section 8. With respect to any loss set forth in sub-section (c) of the final paragraph of Section 4 of this bond which is recoverable or recovered in whole or in part under any other bonds or policies issued by the Underwriter to the Insured or to any predecessor in interest of the Insured and terminated or cancelled or allowed to expire and in which the period for discovery has not expired at the time any such loss thereunder is discovered, the total liability of the Underwriter under this bond and under such other bonds or policies shall not exceed, in the aggregate, the amount carried hereunder on such loss or the amount available to the Insured under such other bonds or policies, as limited by the terms and conditions thereof, for any such loss if the latter amount be the larger.

If the coverage of this bond supersedes in whole or in part the coverage of any other bond or policy of insurance issued by an insurer other than the Underwriter and terminated, cancelled or allowed to expire, the Underwriter, with respect to any loss sustained prior to such termination, cancellation or expiration and discovered within the period permitted under such other bond or policy for the discovery of loss thereunder, shall be liable under this bond only for that part of such loss covered by this bond as is in excess of the amount recoverable or recovered on account of such loss under such other bond or policy, anything to the contrary in such other bond or policy notwithstanding.

### OTHER INSURANCE OR INDEMNITY

Section 9. Coverage afforded hereunder shall apply only as excess over any valid and collectible insurance or indemnity obtained by the Insured, or by a Transportation Company, or by another entity on whose premises the loss occurred or which employed the person causing the loss or the messenger conveying the Property involved.

TSB 5867a

## OWNERSHIP

Section 10. This bond shall apply to loss of Property (1) owned by the Insured, (2) held by the Insured in any capacity, or (3) for which the Insured is legally liable. This bond shall be for the sole use and benefit of the Insured named in the Declarations.

## DEDUCTIBLE AMOUNT

Section 11. The Underwriter shall be liable hereunder only for the amount by which any single loss, as defined in Section 4, exceeds the Single Loss Deductible amount for the Insuring Agreement or Coverage applicable to such loss, subject to the Aggregate Limit of Liability and the applicable Single Loss Limit of Liability.

The Insured shall, in the time and in the manner prescribed in this bond, give the Underwriter notice of any loss of the kind covered by the terms of this bond, whether or not the Underwriter is liable therefor, and upon the request of the Underwriter shall file with it a brief statement giving the particulars concerning such loss.

## TERMINATION OR CANCELLATION

Section 12. This bond terminates as an entirety upon occurrence of any of the following: - (a) 60 days after the receipt by the Insured of a written notice from the Underwriter of its desire to cancel this bond, or (b) immediately upon the receipt by the Underwriter of a written notice from the Insured of its desire to cancel this bond, or (c) immediately upon the taking over of the Insured by a receiver or other liquidator or by State or Federal officials, or (d) immediately upon the taking over of the Insured by another institution, or (e) immediately upon exhaustion of the Aggregate Limit of Liability, or (f) immediately upon expiration of the Bond Period as set forth in Item 2 of the Declarations.

This bond terminates as to any Employee or any partner, officer or employee of any Processor - (a) as soon as any Insured, or any director or officer not in collusion with such person, learns of any dishonest or fraudulent act committed by such person at any time, whether in the employment of the Insured or otherwise, whether or not of the type covered under Insuring Agreement (A), against the Insured or any other person or entity, without prejudice to the loss of any Property then in transit in the custody of such person, or (b) 15 days after the receipt by the Insured of a written notice from the Underwriter of its desire to cancel this bond as to such person.

Termination of the bond as to any Insured terminates liability for any loss sustained by such Insured which is discovered after the effective date of such termination.

In witness whereof, the Underwriter has caused this bond to be executed on the Declarations page.

RIDER

To be attached to and form part of Financial Institution Bond, Standard Form No. 15, No. BFD1045523

In favor of Briar Capital LP

It is agreed that:

1.    The following is added to Section 2. Exclusions:

Loss resulting directly or indirectly from the dishonest or fraudulent acts of an Employee if any Insured, or any director or officer of an Insured who is not in collusion with such person, knows or knew at any time, of any dishonest or fraudulent act committed by such person at any time, whether in the employment of the Insured or otherwise, whether or not of the type covered under insuring agreement (A), against the Insured or any other person or entity and without regard to whether the knowledge was obtained before or after the commencement of this bond. Provided, however, that this exclusion does not apply to loss of any Property already in transit in the custody of such person at the time such knowledge was obtained or to loss resulting directly from dishonest or fraudulent acts occurring prior to the time such knowledge was obtained.

2.    This Rider is effective as of 12:01 a.m. on 12/20/2015

**KNOWLEDGE OF PRIOR DISHONESTY RIDER**
FOR USE WITH FINANCIAL INSTITUTION BOND,
STANDARD FORM NO. 14, 24, AND 25
REVISED    September 2005

SR 6275

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

FINANCIAL INSITUTION BOND, STANDARD FORM 15

**ERISA ENDORSEMENT**

| PENSION PLANS - ERISA COMPLIANCE | SR6145b, 6/90 | RIDER NO. |
|---|---|---|
| (INSURED) | (EFFECTIVE DATE) | (BOND NUMBER) |
| Briar Capital LP | 12/20/2015 | BFD1045523 |

It is agreed that:

1. "Employee" as used in the attached bond shall include any natural person who is a director or trustee of the Insured while such director or trustee is engaged in handling funds or other property of any Employee Welfare or Pension Benefit Plan owned, controlled or operated by the Insured or any natural person who is a trustee, manager, officer or employee of any such Plan.

2. If the bond, in accordance with the agreements, limitations and conditions thereof, covers loss sustained by two or more Employee Welfare or Pension Benefit Plans or sustained by any such Plan in addition to loss sustained by an Insured other than such Plan, it is the obligation of the Insured or the Plan Administrator(s) of such Plans under Regulations published by the Secretary of Labor implementing Section 13 of the Welfare and Pension Plans Disclosure Act of 1958 to obtain under one or more bonds issued by one or more Insurers an amount of coverage for each such Plan at least equal to that which would be required if such Plans were bonded separately.

3. In compliance with the foregoing, payment by the Company in accordance with the agreements, limitations and conditions of the bond shall be held by the Insured, or, if more than one, by the Insured first named, for the use and benefit of any Employee Welfare or Pension Benefit Plan sustaining loss so covered and to the extent that such payment is in excess of the amount of coverage required by such Regulations to be carried by said Plan sustaining such loss, such excess shall be held for the use and benefit of any other such Plan also covered in the event that such other Plan discovers that it has sustained loss covered thereunder.

**Page 2 - PENSION PLANS - ERISA COMPLIANCE**

4. If money or other property of two or more Employee Welfare or Pension Benefit Plans covered under the bond is commingled, recovery for loss of such money or other property through fraudulent or dishonest acts of Employees shall be shared by such Plans on a pro rata basis in accordance with the amount for which each such Plan is required to carry bonding coverage in accordance with the applicable provisions of said Regulations.

5. The Deductible Amount of this bond applicable to loss sustained by a Plan through acts committed by an Employee of the Plan shall be waived, but only up to an amount equal to the amount of coverage required to be carried by the Plan because of compliance with the provisions of the Employee Retirement Income Security Act of 1974.

6. Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the bond, other than as stated herein.

All other terms and conditions of the Bond remained unchanged.

**RIDER**

To be attached to and form part of Financial Institution Bond, Standard Form No.15    , No. BFD1045523 in favor of Briar Capital LP

It is agreed that:

1.The attached bond is amended by adding an Insuring Agreement as follows:

COMPUTER SYSTEMS FRAUD

Loss resulting directly from a fraudulent

 (1)  entry of Electronic Data or Computer Program into, or

 (2)  change of Electronic Data or Computer Program within

any Computer System utilized by the Insured, whether owned or leased; or any Computer system identified in the application for this bond; or a Computer System first used by the Insured during the Bond Period, as provided by General Agreement B of this bond;

provided that the entry or change causes

 (i)  Property to be transferred, paid or delivered

 (ii)  an account of the Insured, or of its customer, to be added, deleted, debited or credited, or

 (iii) an unauthorized account or a fictitious account to be debited or credited.

In this Insuring Agreement, fraudulent entry or change shall include such entry or change made by an Employee of the Insured acting in good faith on an instruction from a software contractor who has a written agreement with the Insured to design, implement or service programs for a Computer System covered by this Insuring Agreement.

2.  In addition to the Conditions and Limitations in the bond, the following, applicable to the Computer Systems Fraud Insuring Agreement, are added:

DEFINITIONS

(A)  Computer Program means a set of related electronic instructions which direct the operations and functions of a computer or devices connected to it which enable the computer or devices to receive, process, store or send Electronic Data;

(B)  Computer System means

 (1) computers with related peripheral components, including storage components wherever located,

(2) systems and applications software,

(3) terminal devices, and

(4) related communication networks

by which Electronic Data are electronically collected, transmitted, processed, stored and retrieved;

(C)  Electronic Data means facts or information converted to a form usable in a Computer System by Computer Programs, and which is stored on magnetic tapes or disks, or optical storage disks or other bulk media.

## EXCLUSIONS

(A)  loss resulting directly or indirectly from the assumption of liability by the Insured by contract unless the liability arises from a loss covered by the Computer Systems Fraud Insuring Agreement and would be imposed on the Insured regardless of the existence of the contract;

(B)  loss resulting directly or indirectly from negotiable instruments, securities, documents or other written instruments which bear a forged signature, or are counterfeit, altered or otherwise fraudulent and which are used as source documentation in the preparation of Electronic Data or manually keyed into a data terminal;

(C)  loss resulting directly or indirectly from

(1) mechanical failure, faulty construction, error in design, latent     defect, fire, wear or tear, gradual deterioration, electrical disturbance or electrical surge which affects a Computer System, or

(2) failure or breakdown of electronic data processing media, or

(3) error or omission in programming or processing;

(C)  loss resulting directly or indirectly from the input of Electronic Data into a Computer System terminal device either on the premises of a customer of the Insured or under the control of such a customer by a person who had authorized access to the customer's authentication mechanism;

(E)  loss resulting directly or indirectly from the theft of confidential information

## SERIES OF LOSSES

All loss or series of losses involving the fraudulent acts of one individual, or involving fraudulent acts in which one individual is implicated, whether or not that individual is specifically identified, shall be treated as a Single Loss and subject to the Single Loss Limit of Liability.  A series of losses involving unidentified individuals but arising from the same method of operation shall be deemed to involve the same individual and in that event shall be treated as a Single Loss and subject to the Single Loss Limit of Liability.

3.  The exclusion below, found in financial institution bonds forms 14 and 25, does not apply to the Computer Systems Fraud Insuring Agreement.

    "loss involving any Uncertificated Security except an Uncertificated Security of any Federal Reserve Bank of the United States or when covered under Insuring agreement (A);"

4.  This rider shall become effective as of 12:01 a.m. standard time on 12/20/2016

*Anne Pandolfe*

BY:_____

**Authorized Representative**

## RIDER

To be attached to and form part of Financial Institution, Standard Form No.15 , BFD1045523
No.  Briar Capital LP

in favor of

It is agreed that:

1. The attached bond is amended:

   (a)   by deleting the numbered paragraph beginning

   "each natural person, partnership or corporation authorized by the insured to perform services as Data Processor..."

   from the definition of "employee" in Section 1;

   (b)   by deleting the following from the second paragraph of Section 12:

   "or any partner, officer or employee of any Processor"

2. This rider shall become effective as of 12:01 a.m. on  12/20/2015

THE HANOVER INSURANCE COMPANY

*Anne Pandolfe*

BY: _____

Anne Pandolfe  , Authorized Agent

DELETE DATA PROCESSING COVERAGE
FOR USE WITH FINANCIAL INSTITUTION BOND,
STANDARD FORMS NOS. 14, 15 and 25, to
DELETE DATA PROCESSING COVERAGE.
REVISED JANUARY, 2004.

SR 6100f
Copyright The Surety Association of America,
2004

## RIDER

To be attached to and form part of Financial Institution, Standard Form No. 15   ,
Policy No.  BFD1045523

in favor of  Briar Capital LP

It is agreed that:

1. The attached bond is amended by adding an Insuring Agreement as follows:

### VOICE INITIATED TRANSFER FRAUD

Loss resulting directly from the Insured having, in good faith, transferred Funds from a
Customer's account through a Computer System covered under the terms of the Computer
Systems Fraud Insuring Agreement in reliance upon a fraudulent voice instruction transmitted by
telephone which was purported to be from

(1)     an officer, director, partner or employee of a Customer of the Insured who was authorized
by the Customer to instruct the Insured to make such transfer,

(2)     an individual person who is a Customer of the Insured, or

(3)     an Employee of the Insured in another office of the Insured who was authorized by the
Insured to instruct other Employees of the Insured to transfer Funds, and was received by
an Employee of the Insured specifically designated to receive and act upon such
instructions,

but the voice instruction was not from a person described in (1), (2), or (3) above, provided that

(I)   such voice instruction was electronically recorded by the Insured and required
password(s) or code word(s) given; and

(ii)  if the transfer was in excess of $100,000, the voice instruction was verified by a
callback according to a prearranged procedure.

---

Page 2 - Voice Initiated Transfer Fraud Insuring Agreement

---

In this Insuring Agreement:

(A) Customer means an entity or individual which has a written agreement with the Insured authorizing the Insured to rely on voice instructions to make transfers and which has provided the Insured with the names of persons authorized to initiate such transfers and  with which the Insured has established an instruction verification  mechanism.

(B) Funds means Money on deposit in an account.

2. In addition to the Conditions and Limitations in the bond and Computer Systems Fraud Insuring Agreement rider, the following provisions are applicable to the Voice Initiated     Transfer Fraud Insuring Agreement:

This Insuring Agreement does not cover loss resulting directly or indirectly from the assumption of liability by the Insured by contract unless the liability arises from a loss covered by this Insuring Agreement and would be imposed on the Insured regardless of the existence of the contract.

Proof of loss for claim under the Voice Initiated Transfer Insuring Agreement must include electronic recording of such voice instructions and the verification call-back, if such call was required.

3. All other terms, conditions and limitations remain the same except as herein expressly modified.

2.  This rider shall become effective as of 12:01 a.m. on  12/20/2015

THE HANOVER INSURANCE COMPANY

*Anne Pandolfe*

BY: _____
        Anne Pandolfe , Authorized Agent

# RIDER

To be attached to and form part of Financial Institution, Standard Form No. 15 ,
Policy No.  BFD1045523

in favor of  Briar Capital LP

It is agreed that:

1. The attached bond is amended by adding an Insuring Agreement as follows:

## TELEFACSIMILE TRANSFER FRAUD

Loss resulting directly from the Insured having, in good faith, transferred or delivered Funds,
Certificated Securities or Uncertificated Securities through a Computer System covered under
the terms of the Computer System Fraud Insuring Agreement in reliance upon a fraudulent
instruction received through a Telefacsimile Device, and which instruction

   (1)    purports and reasonably appears to have originated from

       (a) a Customer of the Insured,

       (b) another financial institution, or

       (c) another office of the Insured

       but, in fact, was not originated by the Customer or entity whose identification it bears and

   (2)    contains a valid test code which proves to have been used by a person who was not
authorized to make use of it and,

   (3)    contains the name of a person authorized to initiate such transfer; and

provided that, if the transfer was in excess of $100,000, the instruction was verified by a call-
back according to a prearranged procedure.

Page 2 - Telefacsimile Transfer Fraud Insuring Agreement

In this Insuring Agreement, Customer means an entity or individual which has a written agreement with the Insured authorizing the Insured to rely on Telefacsimile Device instructions to initiate transfers and has provided the Insured with the names of persons authorized to initiate such transfers, and with which the Insured has established an instruction verification mechanism.

2. In addition to the Conditions and Limitations in the bond and Computer Systems Fraud Insuring Agreement rider, the following provisions are applicable to the Telefacsimile Transfer Fraud Insuring Agreement:

Telefacsimile Device means a machine capable of sending or receiving a duplicate image of a document by means of electronic impulses transmitted through a telephone line and which reproduces the duplicate image on paper.

This bond does not cover loss resulting directly or indirectly from the assumption of liability by the Insured by contract unless the liability arises from a loss covered by the Telefacsimile Transfer Fraud Insuring Agreement and would be imposed on the Insured regardless of the existence of the contract.

Proof of loss for claim under the Telefacsimile Transfer Fraud Insuring Agreement must include a copy of the document reproduced by the Telefacsimile Device.

3. The exclusion below, as found in the attached bond, does not apply to the Telefacsimile Transfer Fraud Insuring Agreement.

"loss involving any Uncertificated Security except an Uncertificated Security of any Federal Reserve Bank of the United States or when covered under Insuring Agreement (A);"

4. All other terms, conditions and limitations remain the same except as herein expressly modified.

2. This rider shall become effective as of 12:01 a.m. on  12/20/2015

THE HANOVER INSURANCE COMPANY

*Anne Pandolfe*

BY: _____
Anne Pandolfe , Authorized Agent

*If this rider is added at inception, the following need not be completed.*

**Bond Number: BFD1045523**

**THIS RIDER CHANGES THE BOND.  PLEASE READ IT CAREFULLY.**

**RIDER NUMBER 11**

This rider modifies insurance provided under the following:

**FINANCIAL INSTITUTION BOND**

It is agreed that Insuring Agreement (D) Forgery or Alteration is amended by adding the following paragraphs:

Loss resulting directly from the Insured accepting, paying or cashing any Negotiable Instrument (except Evidence of Debt) or Withdrawal Orders that bear unauthorized signatures or endorsements shall be deemed a Forgery Loss under this Insuring Agreement.  It shall be a condition precedent to the Insured's right of recovery for loss under this paragraph, that the Insured shall have on file signatures of all persons who are authorized to sign such Negotiable Instruments or Withdrawal Orders.

For the purposes of the Rider only, the definition of Forgery contained in sub-section (i) of the Conditions and Limitations of the attached bond does not apply.

The Limit of Liability on this Rider is $ 100,000 .

The Deductible on this Rider is $ 10,000 .

This rider shall be effective as of 12:01 a.m. on  12/20/2015  .

*Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, limitations, conditions or provisions of the attached bond other than as above stated.*

THE HANOVER INSURANCE COMPANY

*Anne Pandolfe*

BY: _____

Attorney-in-Fact

Form 181-1230 (5-97)

**RIDER THC 100**

**AUDIT EXPENSE/FIDELITY CLAIMS EXPENSE**

To be attached to and form part of Bond No.BFD1045523

in favor of      Briar Capital LP

effective as of   12/20/2015

It is agreed that:

1. The following is inserted as subsection (A) (1) 'AUDIT EXPENSE' of Insuring Agreement (A) 'FIDELITY'.

(A) (1) AUDIT EXPENSE ..................$ 100,000

Expense incurred by the Insured for that part of the cost of audits or examinations required by State or Federal supervisory authorities to be conducted either by such authorities or by independent accountants by reason of the discovery of loss sustained by the Insured through dishonest or fraudulent acts of any Employee which constitute a valid and collectible loss under Insuring Agreement (A) 'FIDELITY'. The total liability of the Underwriter for such expense by reason of such acts of any Employee or in which such Employee is concerned or implicated is limited to the amount stated above opposite "AUDIT EXPENSE"; it being understood, however, that such expense shall be deemed to be loss sustained by the Insured through dishonest or fraudulent acts of one or more of the Employees and the liability of the Underwriter under this paragraph of Insuring Agreement (A) shall be part of and not in addition to the Limit of Liability stated in Item 3 of the Declarations.

2. The following is inserted as subsection (A) (2) 'FIDELITY CLAIMS EXPENSE' of Insuring Agreement (A) 'FIDELITY':

(A) (2) FIDELITY CLAIMS EXPENSE......$100,000

Reasonable expenses necessarily incurred and paid by the Insured in preparing any claim for loss caused by dishonest or fraudulent acts of any of the Insured's Employees which loss constitutes a valid and collectible loss under Insuring Agreement (A) 'FIDELITY' and exceeds the Single Loss Deductible Amount applicable to Insuring Agreement (A) 'FIDELITY'. The liability of the Underwriter under this paragraph of Insuring Agreement (A) shall be in addition to the Limit of Liability stated in Item 3 of the Declarations.

Page 2 - Audit Expense / Fidelity Claims Expense

3. The following paragraph is substituted for 'EXCLUSIONS' Section 2 subsection (u):

"(u) all fees, costs and expenses incurred by the Insured

(1) in establishing the existence of or amount of loss covered under this bond, except to the extent covered under Insuring Agreement (A) (1) 'AUDIT EXPENSE' or (A) (2) 'FIDELITY CLAIMS EXPENSE' or

(2) as a party to any legal proceeding whether or not such legal proceeding exposes the Insured to loss covered by this bond."

4. Any amount(s) payable under paragraphs 1. and 2. of this rider shall be paid to the Insured at the same time as the payment of the valid and collectible claim under Insuring Agreement (A) 'FIDELITY'.

5. All other terms, conditions and limitations remain the same except as herein expressly modified.

THE HANOVER INSURANCE COMPANY

BY: _____

Authorized Agent



**HIRED & NON-OWNED AUTO SUPPLEMENTAL APPLICATION**

**ADMIRAL** INSURANCE COMPANY

Applicant Name: <u>Riverkids Houston Therapy LLC dba Pediatric Home Health</u>

Office(s) Address: <u>2540 East Broadway, Suite K, Pearland, TX 77581</u>
<u>2700 Bee Caves Road, #201, Austin, TX 78746</u>
<u>414 North Main Street, Euless, TX 76039</u>

Description of Operations: <u>Pediatric Home Health Care</u>

**UNDERWRITING INFORMATION**

1. Number of employees, volunteers or contractors using their own vehicles for the Applicant's business? @ 350

2. Number of drivers from above that fall into each of the following categories?

   Regular use of personal auto 100 %    Occasional use of personal auto _____

3. Do any employees, volunteers or contractors use Hired autos for business purposes? ☑ Yes ☐ No
   If yes:
   a. Estimate the number of Hired autos on an annual basis _____ 0
   b. Please indicate percentages on how the Hired autos will be used

      Regular Sales/Service calls _____ Business Trips _____ Transportation of Persons_____ Other_____

4. How often are non-owned autos used in the insured's business?
   ☑ Daily ☐ Weekly ☐ Monthly

5. What is your minimum age requirement for all drivers? 21 yo

6. What is the maximum distance traveled per day by any driver in the course of their employment? *appromately 50 miles*

7. Do any drivers ever transport clients? ☐ Yes ☑ No

   If yes:
   a. In the client's vehicle?          ☐ Yes ☑ No
   b. In the driver's personal vehicle?  ☐ Yes ☑ No
   c. Please explain the frequency of such transportation:
      n|a

8. Does the applicant have a formal driver selection program?    ☐ Yes ☑ No

9. Are MVR's for all drivers secured before their hire?    ☑ Yes ☐ No   i

HNOA Supp. (6/16)

10. How often are driver MVR's obtained and reviewed? _upon hire and then annually_

11. Do you prohibit driving if a driver is unlicensed, has a suspended/revoked licensed or has a major conviction such as a DUI/DWI, reckless driving, leaving the scene or other similar driving conviction? ☒ Yes  ☐ No

12. Do any drivers have either moving violations or accidents totaling more than two in the past 3 years or more than three in the past 5 years? ☐ Yes  ☒ No

13. Do you obtain and verify valid personal auto insurance for each driver annually? ☒ Yes  ☐ No

    If yes, what are the minimum limits of liability that you require for each driver? _minimum req. by state_

14. Are written accident reports required and kept on file? ☒ Yes  ☐ No

15. Is there a follow-up procedure in place for drivers involved in accidents? ☐ Yes  ☒ No

16. Is there a penalty/reward system in place for accidents/safe driving? ☐ Yes  ☒ No

17. Do you offer any type of driver training and/or safety programs? ☐ Yes  ☒ No

    If yes, please provide details:_____

18. Has any Hired or Non-owned auto liability claim or suit been made or brought against the Applicant in the past five years? ☐ Yes  ☒ No

    If yes, please
    explain:_____
    _____
    _____

19. Are you aware of any incident or circumstance that could reasonably be expected to become a Hired or Non-Owned auto liability claim or suit that has not been reported to an insurance company? ☐ Yes  ☒ No

    If yes, please
    explain:_____
    _____
    _____

**\*\* PLEASE SUBMIT FIVE (5) YEARS OF CURRENTLY VALUED LOSS RUNS WITH THIS APPLICATION \*\***

HNOA Supp. (6/16)

I/We declare that I/we have reviewed this Application for accuracy before signing it, that the above statements and representations are true and correct, and that no facts have been suppressed or misstated. I/We understand that this is an application for insurance only and that the completion and submission of this Application does not bind the Company to sell nor the applicant to purchase this insurance. I/We nevertheless acknowledge that any contract of insurance issued by the Company in response to this Application will be in full reliance upon the statements and representations made in this Application. Any person who knowingly and with intent to defraud any insurance company or other person, files an application for insurance, or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any material fact, commits a fraudulent insurance act, which is a crime and may also be subject to civil penalty. I/We hereby declare that the above statements and particulars are true and I/we agree that this Application shall be the basis for any contract of insurance issued by the Company in response to it.

Signature:      x _Keith_____      Current Date:   _09/13/2016_____

Typed Name:  x _Keith Rockwell_____      Title  x _Managing Director_____

HNOA Supp. (6/16)

# 2017-24250 / Court: 270

## SALE OF ACCOUNTS AND SECURITY AGREEMENT

Date: May 8, 2012.

Forward Components, Inc., a California corporation ("Seller") and Briar Capital, LP, a Texas limited partnership ("Factor" or "Purchaser"), hereby agree to the terms and conditions set forth in this Sale of Accounts and Security Agreement ("Agreement"):

Section 1.1 Definitions. All terms in this Agreement shall have the meanings given those terms in the UCC unless expressly defined otherwise in this Agreement including, but not limited to, Exhibit 1.1.

Section 1.2 Other Referential Provisions.

(a)     Except as otherwise expressly provided herein, all accounting terms not specifically defined or specified herein shall have the meanings generally attributed to such terms under GAAP including, without limitation, applicable statements and interpretations issued by the Financial Accounting Standards Board and bulletins, opinions, interpretations and statements issued by the American Institute of Certified Public Accountants or its committees.

(b)     All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural, and the plural shall include the singular.

(c)     The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provisions of this Agreement.

(d)     Titles of Articles and Sections in this Agreement are for convenience only, do not constitute part of this Agreement and neither limit nor amplify the provisions of this Agreement, and all references in this Agreement to Articles, Sections, Subsections, paragraphs, clauses, sub clauses, Schedules or Exhibits shall refer to the corresponding Article, Section, Subsection, paragraph, clause or sub clause of, or Schedule or Exhibit attached to, this Agreement, unless specific reference is made to the articles, sections or other subdivisions or divisions of, or to schedules or exhibits to, another document or instrument.

(e)     Each definition of a document in this Agreement shall include such document as amended, modified, supplemented or restated from time to time in accordance with the terms of this Agreement.

(f)     Except where specifically restricted, reference to a party to this Agreement includes that party and its successors and assigns.

Section 1.3     Exhibits and Schedules.   All Exhibits and Schedules attached hereto are by reference made a part hereof.

Section 2. Purchase & Sale of Accounts.

(a)     Seller hereby offers to sell, assign, transfer, convey and deliver to Factor, as absolute owner, in accordance with the procedure detailed herein, all of Seller's right, title and interest in and to Seller's Accounts and Related Interests.

(b)     All Accounts shall be submitted to Factor on a Schedule of Accounts Sold/Bill of Sale listing each Account separately. The Schedule of Accounts Sold/Bill of Sale shall be in the form attached hereto as Exhibit "2(b)," or in such other form as required by Factor, and shall be signed by a person acting or purporting to act on behalf of Seller. At the time the Schedule of Accounts Sold/Bill of Sale is presented, Seller shall also deliver to Factor one copy of an invoice for each Account together with evidence of shipment, furnishing and/or delivery of the Goods or rendition of service(s). All invoices shall plainly state on their face the amounts payable hereunder are payable to Factor at the remittance address set forth below.

P.O. Box 421759
Houston TX, 77242-1759

(c)     Factor shall have no obligation to purchase Accounts, and the decision to do so shall be exercised in Factor's sole discretion.

(d)     Factor shall have no liability of any kind for exercising or failing to exercise any rights or remedies Factor may have under this Agreement or otherwise. In the event Factor declines to purchase or make advances against Accounts owing from a Customer, and in advising Seller of such decline Factor furnishes Seller with information as to the credit standing of the Customer, such information shall be deemed to have been requested of Factor by Seller and Factor's advice containing such information shall be recognized as a privileged and

1

**EXHIBIT B**

confidential communication. Seller agrees that such information shall not be given to Seller's Customer or to Seller's sales representative(s). Factor shall have the right to charge back to Seller directly or to Seller's Reserve Account the amount of such Full Recourse Receivables at any time and from time to time either before or after their payment due date. Seller agrees to pay Factor upon demand the full amount thereof, together with all expenses incurred by Factor up to the date of such payment, including, but not limited to, reasonable attorney's fees costs and disbursements in attempting to collect or enforce such payment or payment of such Account(s)s

Section 3. **Purchase Price and Commissions.**

(a)     The purchase price that Factor shall pay to Seller for each Purchased Account shall equal the Net Invoice Amount thereof less Factor's factoring commission, as specified below. No discount, credit, allowance or deduction with respect to any Purchased Account, unless shown on the face of an invoice, shall be granted or approved by Seller to any Customer without Factor's prior written consent.

(b)     The purchase price (as computed above), less (i) any Required Reserve Amount or
credit balance that Factor, in Factor's sole discretion, determines to hold, (ii) moneys remitted, paid, or otherwise advanced by Factor to or on behalf of Seller (including any amounts which Seller may reasonably be obligated to pay in the future), and (iii) any other charges including but not limited to Factor's Costs provided for by this Agreement, shall be payable by Seller to Factor on the Date of Collection.

(c)     Factor shall be entitled to withhold a Required Reserve Amount, and may revise, in its sole discretion, the Required Reserve Amount or Reserve Percentage at any time and from time to time if Factor deems it necessary to do so in order to protect Factor's interests. In no event shall Seller permit a Reserve Shortfall to occur. Factor may charge against the Required Reserve Account any amount for which Seller may be obligated to pay Factor at any time, whether under the terms of this Agreement, or otherwise, including, but not limited to, the repayment of any over advance, and any damages suffered by Factor as a result of Seller's breach of any provision of Section 4 hereof (whether intentional or unintentional), any adjustments due and any attorneys' fees, costs and disbursements due. Seller recognizes that the Required Reserve Account may, to the extent Purchased Accounts remain uncollected, represent bookkeeping entries only and

not cash funds. It is further agreed that with respect to the balance in the Required Reserve Account, Factor is authorized to withhold, without giving prior notice to Seller, such payments and credits otherwise due to Seller under the terms of this Agreement for reasonably anticipated claims or to adequately satisfy reasonably anticipated obligation(s) Seller may owe Factor. If an Event of Default has occurred and is continuing, or, in the event Seller shall cease selling Accounts to Factor, Factor shall be under no obligation to pay the amount in the Required Reserve Account until all Accounts listed on all Schedules of Accounts have been collected or Factor has determined, in its sole discretion, that it will make no further efforts to collect any Accounts and all sums due Factor hereunder have been paid. Factor shall have the right of setoff and recoupment with respect to the Reserve Account and any other sums on deposit with Purchaser.

(d)     In Factor's sole discretion, in accordance with the terms of this Agreement, Factor may from time to time advance to Seller against the purchase price of Purchased Accounts purchased by Factor hereunder, sums up to the lesser of the Maximum Line Amount or eighty-five percent (85%) of the aggregate purchase price of Purchased Accounts outstanding at the time any such advance is made, less: (1) Any such Purchased Accounts that are in dispute; (2) any such Purchased Accounts that Factor, in its sole discretion, deems are owing from a Customer that is not credit worthy; (3) any such Purchased Accounts that are unpaid in excess of ninety (90) days past the purchase date (one hundred and five (105) days if the receivables are due from Honeywell, Inc.) as specified on the original invoice; (4) any such Purchased Accounts that are owing from a Customer for which the amount of Accounts that are unpaid in excess of ninety (90) days past the purchase date (one hundred and five (105) days if the receivables are due from Honeywell, Inc.) as specified on the original invoice is equal to or greater than twenty-five percent (25%) of the total amount of all Accounts owing from that Customer; (5) any such Purchased Accounts which Factor, in its sole discretion, deems to be ineligible; and (6) any fees, actual or estimated, that are chargeable to the Reserve Account. Any advance shall be payable on demand.

(e)     For Factor's services hereunder, Seller shall pay and Factor shall be entitled to receive a factoring commission equal to one and one half percent (1.5%) of the gross invoice amount of each Purchased Account, which commission shall be due and payable to Factor on the date such Purchased Account arises; plus, for any Purchased Account which remains

unpaid in excess of thirty (30) days from the day the Account was purchased, an additional quarter percent (0.25%) for each five (5) day period or portion thereof thereafter until the Purchased Account is paid or charged back by Factor, in its sole discretion. Factoring commissions shall be chargeable to Seller's Required Reserve Amount.

(f)     For commission calculation purposes, collections will be applied against outstanding invoices; three (3) business days following receipt by mail, one (1) business day following receipt by ACH, and on the same day if received by wire at or before 11:00 am central time.

(g)     Factor will charge Seller a onetime documentation fee totaling seven hundred fifty dollars ($750). Said fee will be deemed nonrefundable and fully earned upon receipt.

(h)     Factor's commission is based upon Seller's maximum selling terms of net ninety (90) days, and Seller will not grant additional dating to any customer without Factor's prior written approval.

(i)     IT IS THE INTENTION OF THE PARTIES HERETO THAT AS TO ALL PURCHASED ACCOUNTS, THE TRANSACTIONS CONTEMPLATED HEREBY SHALL CONSTITUTE A TRUE PURCHASE AND SALE OF ACCOUNT(S) UNDER TEXAS BUSINESS AND COMMERCE CODE § 9.318 AND CHAPTER 306 OF THE TEXAS FINANCE CODE OR ANY OTHER APPLICABLE LAW AND AS SUCH, THE SELLER SHALL HAVE NO LEGAL OR EQUITABLE INTEREST IN THE ACCOUNTS SOLD. NEVERTHELESS, IN THE EVENT ANY PORTION OF THIS TRANSACTION IS CHARACTERIZED AS A LOAN, THE PARTIES HERETO INTEND TO CONTRACT IN STRICT COMPLIANCE WITH APPLICABLE USURY LAW FROM TIME TO TIME IN EFFECT. IN FURTHERANCE THEREOF SUCH PARTIES STIPULATE AND AGREE THAT NONE OF THE TERMS AND PROVISIONS CONTAINED IN THIS AGREEMENT SHALL EVER BE CONSTRUED TO CREATE A CONTRACT TO PAY, FOR THE USE, FORBEARANCE OR DETENTION OF MONEY, INTEREST IN EXCESS OF THE MAXIMUM RATE (AS HEREINAFTER DEFINED) FROM TIME TO TIME IN EFFECT UNDER APPLICABLE LAW. NEITHER SELLER, ANY PRESENT OR FUTURE GUARANTOR OR ANY OTHER PERSON HEREAFTER BECOMING LIABLE FOR THE

PAYMENT OF THE ADVANCES OR OTHER OBLIGATIONS DUE HEREUNDER, SHALL EVER BE LIABLE FOR ANY OBLIGATION THAT MAY BE CHARACTERIZED AS UNEARNED INTEREST THEREON OR SHALL EVER BE REQUIRED TO PAY ANY OBLIGATION THAT MAY BE CHARACTERIZED AS INTEREST THEREON IN EXCESS OF THE MAXIMUM AMOUNT THAT MAY BE LAWFULLY CHARGED UNDER APPLICABLE LAW FROM TIME TO TIME IN EFFECT, AND THE PROVISIONS OF THIS SECTION SHALL CONTROL OVER ALL OTHER PROVISIONS OF THIS AGREEMENT WHICH MAY BE IN CONFLICT THEREWITH. IF ANY INDEBTEDNESS OR OBLIGATION OWED BY SELLER HEREUNDER IS DETERMINED TO BE IN EXCESS OF THE LEGAL MAXIMUM, OR FACTOR SHALL OTHERWISE COLLECT MONEYS WHICH ARE DETERMINED TO CONSTITUTE INTEREST WHICH WOULD OTHERWISE INCREASE THE INTEREST ON ALL OR ANY PART OF SUCH OBLIGATIONS TO AN AMOUNT IN EXCESS OF THAT PERMITTED TO BE CHARGED BY APPLICABLE LAW THEN IN EFFECT, THEN ALL SUCH SUMS DETERMINED TO CONSTITUTE INTEREST IN EXCESS OF SUCH LEGAL LIMIT SHALL, WITHOUT PENALTY, BE PROMPTLY APPLIED TO REDUCE THE THEN OUTSTANDING OBLIGATIONS OR, AT FACTOR'S OPTION, RETURNED TO SELLER OR THE OTHER PAYOR THEREOF UPON SUCH DETERMINATION. IF AT ANY TIME THE RATE AT WHICH INTEREST IS PAYABLE HEREUNDER (IF ANY) EXCEEDS THE MAXIMUM RATE, THE AMOUNT OUTSTANDING HEREUNDER SHALL CEASE BEARING INTEREST UNTIL SUCH TIME AS THE TOTAL AMOUNT OF INTEREST ACCRUED HEREUNDER EQUALS (BUT DOES NOT EXCEED) THE MAXIMUM RATE APPLICABLE HERETO. AS USED IN THIS SECTION, THE TERM "APPLICABLE LAW" MEANS THE LAWS OF THE STATE OF TEXAS OR, IF DIFFERENT, THE LAWS OF THE STATE OR TERRITORY IN WHICH THE SELLER RESIDES, WHICHEVER LAW ALLOWS THE GREATER RATE OF INTEREST, AS SUCH LAWS NOW EXIST OR MAY BE CHANGED OR AMENDED OR COME INTO EFFECT IN THE FUTURE AND THE TERM "MAXIMUM RATE" MEANS THE MAXIMUM NONUSURIOUS RATE OF

3

INTEREST THAT FACTOR IS PERMITTED UNDER APPLICABLE LAW TO CONTRACT FOR, TAKE, CHARGE OR RECEIVE WITH RESPECT TO THE ADVANCES.

(j)     Transfer. Upon Factor's acceptance of each Purchased Account, Factor shall be the sole owner and holder of such Purchased Account. Seller hereby sells, transfers, conveys and assigns to Factor all of its right, title and interest in and to each Purchased Account effective at the time of acceptance thereof by Factor. Seller agrees to execute and deliver to each Account Debtor obligated under an Account and/or a Purchased Account such written notice of sale of the Purchased Account as Factor may request.

(k)     Accounting Information. Factor shall provide Seller with information on the Purchased Accounts and a monthly reconciliation of the factoring relationship relating to billing, collection and account maintenance such as aging, posting, error resolution and mailing of statements. All of the foregoing shall be in a format and in such detail, as Factor, in its sole discretion, deems appropriate. Factor's books and records shall be admissible in evidence without objection as prima facie evidence of the status of the Purchased and non purchased Accounts and Required Reserve Account between Factor and Seller. Each statement, report, or accounting rendered or issued by Factor to Seller shall be deemed conclusively accurate and binding on Seller unless within fifteen (15) days after the date of issuance Seller notifies Factor to the contrary by registered or certified mail, setting forth with specificity the reasons why Seller believes such statement, report, or accounting is inaccurate, as well as what Seller believes to be correct amount(s) therefore. Seller's failure to receive any monthly statement shall not relieve it of the responsibility to request such statement and Seller's failure to do so shall nonetheless bind Seller to whatever Factor's records would have reported. Seller's delivery of any notice under this section shall not, by itself, deem any statement, report or accounting rendered or issued by Factor inaccurate.

Section 4. Seller's Representations and Covenants. Seller, as well as each of Seller's principals, officers, managers, members, and/or partners represent, warrant, and covenant to Factor that:

(a)     Seller is either a corporation, limited liability company, limited partnership or other form of Registered Organization, is duly organized, validly existing and in good standing under the laws of the state of its incorporation or organization and is qualified and authorized to do business and is in good standing in all states in which such qualification and good standing are necessary or desirable.

(b)     The execution, delivery and performance by Seller of this Agreement does not and will not constitute a violation of any applicable law, violation of Seller's articles of incorporation or organization or bylaws or operating agreement or any material breach of any other document, agreement or instrument to which Seller is a party or by which Seller is bound.

(c)     The Agreement is a legal, valid and binding obligation of Seller enforceable against it in accordance with its terms.

(d)     Immediately prior to the execution and at the time of delivery of each Schedule of Account, Seller is the sole owner and holder of each of the Accounts described thereon and that upon Factor's acceptance of each Purchased Accounts; it shall become the sole owner and holder of such Purchased Account(s).

(e)     No Purchased Account shall have been previously sold or transferred or be subject to any lien, encumbrance, security interest or other claim of any kind of nature. Seller will not factor, sell, transfer, pledge or give a security interest in any of its Accounts to anyone other than Factor. There are no financing statements now on file in any public office covering any Collateral of Seller of any kind, real or personal, in which Seller is named or has signed as the debtor, except the financing statement or statements filed or to be filed in respect of this Agreement or those statements now on file that have been disclosed in writing by Seller to Factor as reflected on the attached Exhibit 4(e). Seller will not execute any financing statement in favor of any other Person, except Factor, during the Term of this Agreement.

(f)     The amount of each Purchased Account is due and owing to Seller and represents an accurate statement of a bona fide sale, delivery and acceptance of Goods or performance of service by Seller to or for an Account Debtor pursuant to an arm's length transaction. The terms for payment of Purchased Accounts are not more than seventy-five (75) days from date of invoice and the payment of such Purchased Accounts is not contingent upon the fulfillment by Seller of any further performance of any nature whatsoever. Each Account Debtor's business is solvent to the best of Seller's knowledge.

4

(g)    There are and shall be no set-offs, allowances, discounts, deductions, counterclaims, or disputes with respect to any Purchased Account, either at the time it is accepted by Factor for Factor or prior to the date it is to be paid. Seller shall inform Factor, in writing, immediately upon learning that there exists any Account, which is subject to a Dispute. Seller shall accept no returns and shall grant no allowance or credit to any Account Debtor without notice to and the prior written approval of Factor. Seller shall provide to Factor for each Account Debtor who is indebted on a Purchased Account that has been purchased, a weekly report in a form and substance satisfactory to Factor itemizing all such returns and allowances made during the previous week with respect to such Purchased Accounts and at Factor's option a check (or wire transfer) payable to Factor for the amount thereof or in Factor's sole and exclusive discretion, Factor may accept the issuance of a Credit Memo and apply same to Seller's Required Reserve Account.

(h)    Seller's address, as set forth in any Application submitted to Factor, is Seller's mailing address, its chief executive office, principal place of business and the office where all of the books and records concerning the Purchased Accounts are maintained which shall not be changed without giving thirty (30) days prior written notice to Factor.

(i)    Seller shall maintain its books and records in accordance with GAAP and shall reflect on its books the absolute sale of the Purchased Accounts to Factor. Seller shall furnish Factor, upon request, such information and statements, as Factor shall request from time to time regarding Seller's business affairs, financial condition and results of its operations. Without limiting the generality of the foregoing, Seller shall provide Factor, on or prior to the 30th day of each month, unaudited financial statements with respect to the prior month and, within ninety (90) days after the end of each of Seller's fiscal years, annual financial statements and such certificates relating to the foregoing as Factor may request including, without limitation, a monthly certificate from the president and chief financial officer of Seller stating whether any Events of Default have occurred and stating in detail the nature of the Events of Default. Seller will furnish to Factor upon request a current listing of all open and unpaid accounts payable and Accounts, and such other items of information that Factor may deem necessary or appropriate from time to time. Unless otherwise expressly provided herein or unless Factor otherwise consents, all financial statements and reports furnished to Factor hereunder shall be prepared and

all financial computations and determinations pursuant hereto shall be made in accordance with GAAP, consistently applied.

(j)    Seller has paid and will pay all taxes and governmental charges imposed with respect to sale of Goods and furnish to Factor upon request satisfactory proof of payment and compliance with all federal, state and local tax requirements.

(k)    Seller will immediately notify Factor of (i) the filing of any lawsuit against Seller involving amounts greater than $10,000.00, and (ii) any attachment or any other legal process levied against Seller.

(l)    The Application made or delivered by or on behalf of Seller in connection with this Agreement, and the statements made therein are true and correct at the time that this Agreement is executed. There is no fact which Seller has not disclosed to Factor in writing which could materially and adversely affect the properties, business or financial condition of Seller, or any of the Purchased Accounts or Collateral, or which is necessary to disclose in order to keep the foregoing representations and warranties from being misleading.

(m)    The Statement of Authorized Signatures for Sale/Assignment of Accounts, the form of which is annexed as Exhibit 4(m) and any change in the persons so authorized shall be given to Factor in writing not less than fifteen (15) days prior to such change.

(n)    In no event shall the funds paid to Seller hereunder be used directly or indirectly for personal, family, household or agricultural purposes.

(o)    Seller does business under no trade or assumed names except as indicated below:

**N/A**

(p)    Any invoice or written communication that is issued by Seller to Factor by facsimile transmission is a duplicate of the original and may be relied upon by Factor.

(q)    Any electronic communication of data, whether by e-mail, tape, disk, or otherwise, that Seller remits or causes to be remitted to Factor shall be authentic and genuine and may be relied upon by Factor.

Section 5. **Notice of Purchase.** Seller shall authorize Factor to file at such times and places as Factor may designate such financing statements, continuations and amendments thereto as are necessary or desirable to give notice of Factor's purchase of the Purchased Accounts under the UCC in effect in any applicable jurisdiction and Factor's security interest in Seller's Collateral as provided in Section 6 below.

Section 6. **Collateral.** In order to secure the payment of all obligations of Seller to Factor, in addition to the sale of Purchased Accounts, Seller hereby grants to Factor a Security Interest in and lien upon all of Seller's right, title and interest in and to all of Collateral. Seller agrees to comply with all appropriate laws in order to perfect Factor's security interest in and to the Collateral and to execute such documents as Factor may, from time to time, require, and to deliver to Factor a list of all locations of its Inventory, Equipment and Goods. Seller shall provide written notice for any change in the locations at which it keeps its Inventory, Equipment and Goods at least thirty (30) days prior to any such change. The occurrence of any Event of Default shall entitle Factor to all of the default rights and remedies (without limiting the other rights and remedies exercisable by Factor either prior or subsequent to an Event of Default) as available to a Secured Party under the Uniform Commercial Code then in effect in any other applicable jurisdiction.

Section 7. **Collection.**

(a)     Seller shall notify all Account Debtors and take other necessary or appropriate means to insure that all of Seller's Account(s), whether or not purchased by Factor, shall be paid directly to Factor at a remittance address designated by Factor. Factor shall have the right at any time, either before or after the occurrence of an Event of Default, and without notice to Seller, to notify any or all Account Debtors of the assignment to Factor and to direct such Account Debtors to make payment of all amounts due or to become due to Seller directly to Factor. As to any Account proceeds that do not represent Purchased Accounts and are not allocated to the Reserve Account, and so long as Seller is not in default, Factor shall be deemed to have received any such proceeds of Accounts as a pure pass-through for and on account of Seller.

(b)     Factor, as the sole and absolute owner of the Purchased Accounts, shall have the sole and exclusive power and authority to collect each such Purchased Account, through legal action or otherwise, and Factor may, in its sole discretion,

settle, compromise, or assign, in whole or in part, any of such Purchased Accounts, or otherwise exercise, to the maximum extent permitted by applicable law, any other right now existing or hereafter arising with respect to any of such Purchased Accounts. If Seller receives payment of all or any portion of any of such Purchased Accounts or any other Account, Seller shall notify Factor immediately and shall hold all checks and other instruments so received in trust for Factor and shall deliver to Factor such checks and other instruments without delay.

Section 8. **Payments Received by Seller.** Should Seller receive payment of all or any portion of any Purchased Account, Seller shall immediately notify Factor of the receipt of the payment, hold said payment in trust for Factor separate and apart from Seller's own property and funds, and shall deliver said payment to Factor without delay in the identical form in which received, together with an appropriate endorsement. Should Seller receive any check or other payment instrument with respect to a Purchased Account or after default any Account and fail to surrender and deliver to Factor said check or payment instrument within two (2) business days after Seller receipt thereof, Factor shall be entitled to charge Seller a Misdirected Payment Fee to compensate Factor for the additional administrative expenses that the parties acknowledge is likely to be incurred as a result of such breach. In the event any Goods, the sale of which gave rise to a Purchased Account, are returned to or repossessed by Seller, such Goods shall be held by Seller in trust for Factor, separate and apart from Seller's own property and subject to Factor's sole direction and control.

Section 9. **Power of Attorney.** Seller grants to Factor an irrevocable power of attorney authorizing and permitting Factor, at its sole option, with or without notice to Seller, to do any or all of the following: (a) Endorse the name of Seller on any checks or other evidences of payment whatsoever that may come into the possession of Factor regarding Accounts or Collateral, including checks received by Factor pursuant to Section 7 hereof; (b) Receive, open and dispose of any mail addressed to Seller and put Factor's address on any statements mailed to Account Debtors; (c) Pay, settle, compromise, prosecute or defend any action, claim, conditional waiver and release, or proceeding relating to Purchased Accounts or Collateral; (d) Upon the occurrence of an Event of Default, notify in the name of the Seller, the U.S. Post Office to change the address for delivery of mail addressed to Seller to such address as Factor may designate, provided that Factor shall turn over to Seller all such mail not relating to Purchased

6

Accounts or Collateral; (e) File any financing statement deemed necessary or appropriate by Factor to protect Factor's interest in and to the Purchased Accounts or Collateral, or under any provision of this Agreement; (f) Effect debits to any Demand Deposit or other account that Seller, or Seller's principals who have executed a guaranty agreement, maintain at any Bank for any sums due to or from the Seller under this Agreement; (g) demand, in the Client's name, that any bank that does business with Client confirm the existence of any Control Agreement; (h) request in the Client's name any tax or information return, declaration of estimated tax, or claim for refund, and any amendment or supplement thereto, including supporting schedules, attachments or lists which are supplemental to, or a part of, the return filed, with irrevocable authority, which authority shall be deemed duly designated by the Client's board of directors by resolution and as attorney-in-fact as authorized by Title 26 of the United States Code; and (i) to do all other things necessary and proper in order to carry out this Agreement. The authority granted to Factor herein is irrevocable until this Agreement is terminated and all Obligations are fully satisfied. This power of attorney is coupled with an interest.

Section 10. **Default and Remedies**. An Event of Default shall be deemed to have occurred hereunder and Factor may immediately exercise its rights and remedies with respect to the Purchased Accounts and the Collateral under this Agreement, upon the happening of one or more of the following: (a) Seller shall fail to pay as and when due any amount owed to Factor; (b) There shall be commenced by or against Seller any voluntary or involuntary case under the United States Bankruptcy Code; (c) any assignment for the benefit of creditors; (d) there has been an appointment of a receiver or custodian of Seller or any of the Collateral; (e) Seller has become insolvent in that its debts are greater than the fair value of its assets, or Seller is generally not paying its debts as they become due; (f) Any involuntary lien, garnishment, attachment or the like shall have issued against or shall attach to the Purchased Accounts, the Collateral, or any portion thereof, and the same is not released within ten (10) days; (g) Seller suffers the entry against it of a final judgment for the payment of money in excess of $10,000.00, unless the same is discharged within thirty (30) days after the date of entry thereof or an appeal or appropriate proceeding for review thereof is timely taken and a stay of execution pending such appeal is obtained; (h) Seller has breached any covenant, warranty or representation set forth herein or same was untrue when made; (i) Any report, certificate, schedule,

financial statement, profit and loss statement or other statement furnished by Seller, or by any other person on behalf of Seller, to Factor is not true and correct in any material respect; (j) Seller has a federal or state tax lien filed against any of its properties, or has failed to pay any federal or state tax when due, or failed to file any federal or state tax form as and when due; (k) A material adverse change has occurred in Seller's financial conditions, business or operations; or (l) A change in ownership has occurred with respect to twenty five percent (25%) or more of Seller's capital stock, or membership, or partnership interest. Upon an Event of Default, all Obligations due Factor shall become immediately due and payable and Factor shall be entitled to any form of equitable relief that may be appropriate without having to establish any inadequate remedy at law or other grounds other than to establish that any of its Collateral is subject to being improperly used, moved, dissipated or withheld from Factor. Factor shall be entitled to freeze, debit and/or effect a set-off or recoupment against any fund or account Seller may maintain with any Bank. In the event Factor deems it necessary to seek equitable relief, including, but not limited to, injunctive or receivership remedies, as a result of an Event of Default, Seller waives any requirement that Factor post or otherwise obtain or procure any bond. Alternatively, in the event Factor, in its sole discretion, desires to procure and post a bond, Factor may procure and file with the court a bond in an amount up to and not greater than $10,000.00 notwithstanding any common or statutory law requirement(s) to the contrary. Upon Factor's posting of such bond, it shall be entitled to all benefits as if such bond was posted in compliance with state law. Seller also intentionally and knowingly waives any right it may be entitled to, including an award of attorney's fees or costs, in the event any equitable relief sought by and awarded to Factor is thereafter, for whatever reason(s), vacated, dissolved or reversed. All amounts awarded in any judgment or order shall bear interest at the rate of 18% per annum.

Upon an Event of Default, all of Seller's rights of access to any online, internet services that Purchaser makes available to Seller shall be provisional pending Seller's curing of all such Events of Default. During such period of time, Purchaser may limit or terminate Seller's access to Purchaser's online services. Seller acknowledges that the information Purchaser makes available to Seller constitutes and satisfies any duty to respond to a Request for an accounting or Request regarding a statement of account that is referenced in Texas Business & Commerce Code Section 9.210 or any equivalent section of the Uniform Commercial

7

Code of any other applicable jurisdiction. After an Event of default, the Parties acknowledge that it shall be presumed commercially reasonable and Purchaser shall have no duty to undertake to collect any Account or Account Purchased, including those in which Purchaser receives information from an Account Debtor that a Dispute exists. Furthermore, in the event Purchaser undertakes to collect from or enforce an obligation of an Account Debtor or other person obligated on Collateral and ascertains that the possibility of collection is outweighed by the likely costs and expenses that will be incurred, Purchaser may at any such time cease any further collection efforts and such action shall be considered commercially reasonable. Before Seller may, under any circumstances, seek to hold Purchaser responsible for taking any uncommercially reasonable action, Seller shall be required to first notify Purchaser, in writing, of all reasons why Seller believes Purchaser has acted in any uncommercially reasonable manner and advise Purchaser of the action that Seller believes Purchaser should take. Seller's sole remedy for any breach alleged to have been committed by Purchaser of any obligation or duty owed under the Agreement, any other agreement between Seller and Purchaser or any duty or obligation arising out of or related to this Agreement shall be limited to any amount in the Reserve Account at the time notice of such breach is first given to Purchaser, in writing. Under no circumstances shall Purchaser be liable for any incidental, special or consequential damages, including, but not limited to, loss of goodwill, loss of profit, or any other losses associated therewith, whether Purchaser did or did not have any reason to know of a loss that may result from any general or particular requirement of Seller.

Section 11. **Cumulative Rights; Waivers.** All rights, remedies and powers granted to Factor in this Agreement, or in any other instrument or agreement deliver Seller and Factor, or otherwise available to Factor in equity or at law, are cumulative and may be exercised singularly or concurrently with such other rights as Factor may have. These rights may be exercised from time to time as to all or any part of the Purchased Accounts purchased hereunder or the Collateral as Factor, in its sole discretion, may determine. In the event that any part of this transaction between Seller and Factor is construed to be a loan from Factor to Seller, any advances or payments made as the Purchase Price for all Purchased Accounts shall be secured by the Purchased Accounts and the Collateral and the Factor shall have all rights and remedies available to Factor

in equity and at law in addition to its rights and remedies hereunder. Factor may not be held to have waived its rights and remedies unless the waiver is in writing and signed by Factor. A waiver by Factor of a right, remedy or default under this Agreement on one occasion is not a waiver of any right, remedy or default on any subsequent occasion. Any failure by Factor to exercise, or any delay by Factor in exercising such right or any other right, shall not in any manner impair the subsequent exercise by Factor of any of its rights.

Section 12. **Notices.** Any notice or communication with respect to this Agreement shall be given in writing, sent by (i) personal delivery, or (ii) expedited delivery service with proof of delivery, or (iii) United States mail, postage prepaid, registered or certified mail, return receipt requested, or (iv) prepaid telegram, telex or telecopy, so long as proof of such transmission is maintained, addressed to each party hereto at its address set forth below or to such other address or to the attention of such other person as hereafter shall be designated in writing by the applicable party sent in accordance herewith. Any such notice or communication shall be deemed to have been given and received either at the time of personal delivery or, in the case of delivery service or mail, as of the date of first attempted delivery at the address and in the manner provided herein, or in the case of telegram, telex or telecopy, upon receipt.

Section 13. **Term.** The Original Term of this Agreement shall be from the date hereof until May 8, 2013, provided that this Agreement shall be extended automatically on an annual basis thereafter, unless written notice of termination is given by one party hereto to the other party hereto at least sixty (60) days, but not more than ninety (90) days, prior to the end of the Original Term or any extension thereof. Should Seller terminate this Agreement for any reason prior to the end of any Term, Seller shall not pay Factor an early termination fee. Any such notice of termination, however, and notwithstanding payment in full of all Obligations by Seller, is conditioned on Seller's delivery to Factor of a general release in a form reasonably satisfactory to Purchaser. Seller understands that this provision constitutes an intentional and knowing waiver of its rights under Texas Business & Commerce Code Section 9.513 or under an equivalent section of the Uniform Commercial Code of any other applicable jurisdiction. Factor shall not be required to record any terminations or satisfactions of any of Factor's liens on the Collateral unless and until Seller has executed and delivered to Factor said general release and Seller shall have no authority to do so without

8

Factor's express written consent. Any termination of this Agreement shall not affect Factor's security interest in the Collateral and Factor's ownership of the Purchased Accounts, and this Agreement shall continue to be effective, until all transactions entered into and obligations incurred hereunder have been completed and satisfied in full. Notwithstanding anything to the contrary herein, and assuming no default by Seller in which event Factor may terminate this Agreement without notice, Factor may terminate this Agreement at any time by giving not less than thirty (30) days notice, in which event Seller shall not be obligated to pay any Termination Fee.

Section 14. **Attorney's Fees.** Seller agrees to reimburse Factor for all reasonable attorney's fees, and taxable and non-taxable costs and expenses incurred by Factor in the preparation, negotiation and enforcement of this Agreement and protecting or enforcing its interest in the Accounts or the Collateral, in collecting the Accounts or the Collateral, or in the representation of Factor in connection with any bankruptcy case or insolvency proceeding involving Seller, the Collateral, any Account Debtor or any Accounts including any defense of any Avoidance Claims. Seller hereby authorizes Factor, at Factor's sole discretion, to deduct such fees, costs and expenses from the Required Reserve Account or may make demand therefore. Notwithstanding the existence of any law, statute or rule, in any jurisdiction which may provide Seller with a right to attorney's fees, costs, and/or expenses, Seller hereby waives any and all rights to hereafter seek attorney's fees or costs hereunder and Seller agrees that Factor exclusively shall be entitled to indemnification and recovery of any and all attorney's fees, and taxable and non-taxable costs and expenses in respect to any litigation based hereon, arising out of, or related hereto, whether under, or in connection with, this and/or any agreement executed in conjunction herewith, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of either party and in the enforcement and collection of any judgment entered in such litigation.

Section 15. **Indemnity.** Seller hereby indemnifies and agrees to hold harmless and defend Factor for, from and against any and all claims, judgments, liabilities, fees and expenses (including attorney's fees) which may be imposed upon, threatened or asserted against Factor at any time and from time to time in any way connected with this Agreement or the Collateral. The foregoing indemnification shall apply whether or not such indemnified claims are in any way or to any extent owed, in whole or in part,

under any claim or theory of strict liability, or are caused, in whole or in part, by any negligent act or omission of Factor.

Section 16. **Severability.** Each and every provision, condition, covenant and representation contained in this Agreement is, and shall be construed to be, a separate and independent covenant and agreement. If any term or provision of this Agreement shall to any extent be invalid or unenforceable, the remainder of the Agreement shall not be affected thereby.

Section 17. **Parties in Interest.** All grants, covenants and agreements contained in this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that Seller may not delegate or assign any of its duties or obligations under this Agreement without the prior written consent of Factor. Factor reserves the right to assign its rights and obligations under this agreement in whole or in part to any person or entity.

Section 18. **Governing Law: Submission to Process and Venue.** This agreement shall be deemed a contract made under the laws of the State of Texas and shall be construed and enforced in accordance with and governed by the internal laws of the State of Texas, without reference to the rules thereof relating to conflicts of law. Seller hereby irrevocably submits itself to the exclusive jurisdiction of the state and federal courts located in Texas, and agrees and consents that service of process may be made upon it in any legal proceeding relating to this agreement, the purchase of Accounts or any other relationship between Factor and Seller by any means allowed under state or federal law. Any legal proceeding arising out of or in any way related to this Agreement, the purchase of Accounts or any other relationship between Factor and Seller shall be brought and litigated in only the state or federal courts located in the State of Texas in any county in which the Factor has a business location, the selection of which shall be in the exclusive discretion of Factor. Seller hereby waives and agrees not to assert, by way of motion, as a defense or otherwise, that any such proceeding, is brought in any inconvenient forum or that the venue thereof is improper.

Section 19. **Complete Agreement.** This Agreement, the written documents executed pursuant to this Agreement, if any, and the acknowledgment delivered in connection herewith set forth the entire understanding and agreement of the parties hereto with respect to the transactions contemplated herein

and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. No modification or amendment of or supplement to this Agreement shall be valid or effective unless the same is in writing and signed by the party against whom it is sought to be enforced. There are no unwritten, oral agreements between the parties.

Section 20. **Miscellaneous.**

(a)   Seller acknowledges that there is no, and it will not seek or attempt to establish any, fiduciary relationship between Factor and Seller, and Seller intentionally and knowingly waives any right to assert, now or in the future, the existence or creation of any fiduciary relationship between Factor and Seller in any action or proceeding (whether by way of claim, counterclaim, crossclaim or otherwise) for damages.

(b)   This Agreement shall be deemed to be one of financial accommodation and not assumable by any debtor, trustee or debtor-in-possession in any bankruptcy proceeding without Factor's express written consent and may be suspended in the event a petition in bankruptcy is filed by or against Seller.

(c)   In the event any of Seller's principals, officers, directors, manager(s), members, or partners form a successor entity, whether corporate, partnership, limited liability company or otherwise, similar to that of Seller during the term of this Agreement, such entity shall be deemed to have expressly assumed the obligations due Factor by Seller under this Agreement. Upon the formation of any such entity, Factor shall be deemed to have been granted an irrevocable power of attorney with authority to execute, on behalf of the newly formed successor business, a new UCC-1 or UCC-3 financing statement and have it filed with the appropriate secretary of state or UCC filing office. Factor shall be held-harmless and be relieved of any liability statement or the resulting perfection of a lien in any of the successor entity's assets. In addition, Factor shall have the right to notify the successor entity's account debtors of Factor's lien rights, its right to collect all Accounts, and to notify any new Factor or lender who has sought to procure a competing lien of Factor's right is in such successor entity's assets.

(d)   Seller expressly authorizes Factor to access the systems of and/or communicate with any shipping or trucking company in order to obtain or verify tracking, shipment or delivery status of any Goods relating to any Purchased Account.

(e)   Seller's principal(s) acknowledge that the duty to accurately complete each Schedule of Accounts is critical to this Agreement and as such all obligations with respect thereto are nondelegable. Each of Seller's principal(s) acknowledge that he/she shall remain fully responsible for the accuracy of each Schedule of Accounts delivered to Factor regardless of who is delegated the responsibility to prepare and/or complete such Schedule of Accounts.

(f)   Seller shall indemnify and defend Factor from any loss arising out of the assertion of any Avoidance Claim. Seller shall notify Factor within two (2) business days of it becoming aware of the assertion of an Avoidance Claim.

(g)   Seller agrees to execute any and all forms (i.e. Forms 8821 and/or 2848) that Factor may require in order to enable Factor to obtain and receive tax information issued by the Department of the Treasury, Internal Revenue Service, or receive refund checks.

(h)   Seller will cooperate with Factor in obtaining a control agreement in form and substance satisfactory to Factor with respect to Collateral consisting of: Deposit accounts; Investment property; Letter-of-credit rights; and Electronic chattel paper.

(i)   In order to satisfy any of the Obligations, Seller (as Receiver) authorizes Purchaser (as Originator) to initiate electronic debit entries to Payment Processors through the Automated Clearing House Network to any Receiving Depository Financial Institution where a deposit account is maintained by Seller.

Section 21. **Waiver of Jury Trial, Punitive and Consequential Damages, Etc. Seller and Factor hereby (a) irrevocably waive any right either may have to a trial by jury in respect to any litigation at any time arising directly or indirectly out of, under or in connection with this Agreement or any transaction contemplated hereby or associated herewith; (b) Seller irrevocably and intentionally and knowingly waives, to the maximum extent permitted by law, any right it may have to claim or recover in any such litigation any special, exemplary, punitive or consequential damages, or damages other than, or in addition to, actual damages and Seller hereby releases and exculpates Factor, its officers, directors, employees, agents, attorney's and designees, from**

10

any liability arising from any acts under this Agreement or in furtherance thereof whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for willful misconduct ; (c) and Seller certifies that no party hereto nor any representative or agent or counsel for any party hereto has represented, expressly or impliedly, that such party would not, in the event of litigation, seek to enforce the foregoing waivers; and (d) Seller acknowledges that Factor has been induced to enter into this Agreement and the transactions contemplated hereby, in part, as a result of the mutual waivers and certifications contained in this Section.

In Witness Whereof, the parties have set their hands and seals on the day and year first hereinabove written.

**BRIAR CAPITAL, L.P.,**
**A Texas limited partnership**

By: Briar Capital General, LLC,
    a Texas limited liability company,
    its General Partner

By: _____

Printed Name: _____

Title: _____


**Forward Components, Inc.**

By: _____

Printed Name: JCOTT WILROSZ

Title: President
Address:

11

## EXHIBIT "1.1"

## Definitions to Sale of Accounts and Security Agreement dated May 8, 2012 between Briar Capital, LP and  Forward Components Inc.

"<u>Account(s)</u>" includes a right to payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of or (ii) for services rendered or to be rendered.

"<u>Account Debtor</u>" or "Customer" means any Person who is obligated on an Account, Chattel Paper or General Intangible.

"<u>Advance</u>" means amounts advanced by Factor to the Seller under this Agreement.

"<u>Agreement</u>" means the Sale of Accounts and Security Agreement, including the Exhibits and any Schedules hereto, and all amendments, modifications and supplements hereto and thereto and restatements hereof and thereof.

"<u>Application</u>" means each application made by Seller in connection with this Agreement.

"<u>Avoidance Claim</u>" means any claim that any payment received by Factor from or for the account of an Account Debtor is avoidable under the Bankruptcy Code or any other debtor relief statute.

"<u>Chattel Paper</u>" means a record or records that evidence both a monetary obligation and a security interest in specific goods, a security interest in specific goods and software used in the goods, a security interest in specific goods and license of software used in the goods, a lease of specific goods, or a lease of specific goods and license of software used in the goods.

"<u>Collateral</u>" means and includes all of the Sellers' right, title and interest in and to each of the following, wherever located and whether now or hereafter existing or now owned or hereafter acquired or arising: Accounts; Chattel Paper; Commercial Tort Claims; Deposit Accounts; Documents; Equipment; General Intangibles; Goods (including but not limited to all files, correspondence, computer programs, tapes, disks and related data processing software which contain information identifying or pertaining to any of the Collateral or any Account Debtor or showing the amounts thereof or payments thereon or otherwise necessary or helpful in the realization thereon or the collection thereof); Inventory; Proceeds of Inventory; Investments; Letters of Credit and Letter of Credit rights; and all Supporting Obligations.  All the above whether now owned or hereafter acquired.

"<u>Commercial Tort Claim</u>" means a claim arising in tort with respect to which: (A) The claimant is an organization; or (B) The claimant is an individual and the claim: (i) arose in the course of the claimant's business or profession; and (ii) does not include damages arising out of personal injury to or the death of an individual.

"<u>Date of Collection</u>" means the date a check, draft or other item representing payment on an invoice is received by Factor.

"<u>Default</u>" means any of the events specified in Section 10 of this Agreement that, with the passage of time or giving of notice or both, would constitute an Event of Default.

"<u>Deposit Account</u>" means any demand, time, savings, passbook or like account maintained with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a certificate of deposit that is an instrument under the UCC.

"<u>Dispute</u>" or "<u>Disputed Account</u>" means any claim, whether or not provable, bona fide, or with or without support, made by an Account Debtor as a basis for refusing to pay a Purchased Account, either in whole or in part,

including, but not limited to, any contract dispute, charge back, credit, right to return Goods, or other matter which diminishes or may diminish the dollar amount or timely collection of such Account.

"Documents" means a document of title or a receipt of the type described in UCC 47-7201, subsection B.

"Equipment" means Goods other than Inventory.

"Event of Default" means any of the events specified in Section 10 of this Agreement.

"Factor's Costs" means and includes:  (a) filing, recording, wiring,  publication and search fees incurred by Factor relating to Seller; all costs and expenses incurred by Factor in the enforcement of its rights and remedies under this Agreement; (b) telephone, facsimile and delivery charges, and all the expenses of field examinations of Seller's Books; (c) all expenses for travel, lodging and food incurred by Factor's personnel in collecting the Accounts or realizing upon the Collateral; (d) all costs and expenses incurred in gaining possession of, maintaining, handling, preserving, storing, repairing, shipping, selling, preparing for sale and advertising to sell the Collateral, whether or not a sale is consummated; (e) all expenses involved in fulfilling in whole or in part any purchase order from an account debtor.

"Financial Inability to Pay" means an Account Debtor's insolvency such that the value of its assets are exceeded by its fixed, liquidated and non-contingent liabilities.

"Financing Statement" means each Uniform Commercial Code financing statement naming the Factor as purchaser/secured party and the Seller as Seller/debtor, in connection with this Agreement.

"Full Recourse" means that each Account(s) assigned to and purchased by Factor is with full recourse to Seller and at Seller's sole credit risk.

"GAAP" means generally accepted accounting principles consistently applied and maintained throughout the period indicated and consistent with the prior financial practice of the Person referred to.

"General Intangible" means any personal property, including things in action, other than Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Goods, Inventory, Investment Property, Letters of Credit rights, Letters of Credit and Money. Payment Intangibles and software, however, are included.

"Goods" means all things that are movable when a security interest attaches. The term does not include Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, General Intangibles, Instruments, Investment Property, Letter of Credit Rights, Letters of Credit or Money.

"Instrument" means a negotiable instrument or any other writing that evidences a right to the payment of a monetary obligation, is not itself a security agreement or lease, and is of a type that in ordinary course of business is transferred by delivery with any necessary endorsement or assignment. The term does not include (i) Investment Property, (ii) Letters of Credit, or (iii) writings that evidence a right to payment arising out of the use of a credit or charge card or information contained on or for us with the card.

"Inventory" means Goods which are leased by Seller as lessor, are held by Seller for sale or lease or to be furnished under a contract of service or raw materials, work in process, or materials used or consumed in Seller's business.

"Investment Property" means a security, whether certificated or uncertificated, security entitlement, securities account, commodity contract, or commodity account.

"Letter of Credit Right" a right to payment or performance under a Letter of Credit, whether or not the beneficiary has demanded or is at the time entitled to demand payment or performance. The term does not include the right of a beneficiary to demand payment or performance under a Letter of Credit.

13

"Lien" means, as applied to the property of any Person, the filing of, or any agreement to give, any financing statement under the UCC or its equivalent in any jurisdiction.

"Maximum Line Amount" means five hundred thousand dollars ($500,000).

"Misdirected Payment Fee" means fifteen percent (15%) of the amount of any payment on account of a Purchased Account which has been received by Seller and not delivered in kind to Factor within two (2) business days after the date of receipt by Seller.

"Net Invoice Amount" means the invoice amount of the Purchased Account, less returns (whenever made), all selling discounts (at Factor's option, calculated on shortest terms), and credit or deductions of any kind allowed or granted to or taken by the customer at any time.

"Obligations" means all present and future obligations owing by Seller to Factor whether or not for the payment of money, whether or not evidenced by any note or other instrument, whether direct or indirect, absolute or contingent, due or to become due, joint or several, primary or secondary, liquidated or unliquidated, secured or unsecured, original or renewed or extended, whether arising before, during or after the commencement of any Bankruptcy Case in which Seller is a Debtor, including, but not limited to, any obligations arising pursuant to letters of credit or acceptance transactions or any other financial accommodations.

"Original Term" means the term of this Agreement as reflected in section 13 and "Term" means the Original Term and any extensions thereof.

"Person" means an individual, corporation, partnership, association, trust or unincorporated organization or a government or any agency or political subdivision thereof.

"Purchase Price" means the price that Factor pays Seller for each Purchased Account which price shall equal the Net Invoice Amount less Factor's factoring commission.

"Purchased Account(s)" means an Account which is deemed acceptable for purchase as determined by Factor in the exercise of its sole credit or business judgment and for which Factor has made payment of the sum specified in Section 2 of the Agreement constituting Factor's acceptance of an Account.

"Reserve Account" means a bookkeeping entry on the books of the Factor representing an unpaid portion of the Purchase Price, maintained by Factor to ensure Seller's performance with the provisions hereof.

"Reserve Percentage" means fifteen (15%) percent of the face amount of the Purchased Accounts and as such percent may change in accordance herewith.

"Reserve Shortfall" means the amount by which the Reserve Account is less than the Required Reserve Amount.

"Required Reserve Amount" means the Reserve Percentage multiplied by the unpaid balance of all Purchased Accounts.

"Schedule of Accounts" means a form supplied by Factor from time to time wherein Seller lists those Accounts it requests Factor purchase under the terms of this Agreement.

"Security Interest" means the Liens of Factor on and in the Collateral affected hereby or pursuant to the terms hereof or thereof.

"Supporting Obligation" means a Letter of Credit Right or secondary obligation that supports the payment or performance of an Account, Chattel paper, a Document, a General Intangible, an Instrument, or Investment Property.

"Term" means the Original Term or any extension thereof, as applicable.

"<u>Termination Fee</u>" means a fee payable to Factor in the event Seller terminates this Agreement prior to the end of the Original Term or Term of this Agreement.

"<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in the State of Texas.

## Exhibit 2(b) Schedule of Accounts Sold/Bill of Sale

Client's Name: _____     Schedule Number _____

Page ____ of _____ Date _____ 20___

| Invoice Date | Invoice Number | Name of Account Debtor | Location | Invoice Amount |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
| **TOTAL:** |  |  |  |  |

**ASSIGNMENT:**

KNOW ALL MEN BY THESE PRESENTS, that the undersigned for value received has sold transferred and assigned and does hereby sell, transfer and assign to Briar Capital, LP (hereinafter called the "Buyer"), its successors and assigns, in accordance with the provision of that certain Sale of Accounts and Security Agreement heretofore duly executed and delivered by the undersigned and duly accepted by the Buyer, and any amendments thereto (hereinafter called the "Agreement"), each Account, listed hereon, and all right, title and interest of the undersigned in and to such Account(s) and in and to all merchandise, the sale of which shall have given rise to such Account(s), including all of the undersigned's right of stoppage in transit replevin and reclamation as an unpaid vendor. Each Account is made a part hereof as if attached or incorporated herein for specific terms, conditions, provisions and description of said Account(s).

For the purpose of inducing the Buyer to purchase such Account(s), the undersigned hereby reaffirms all warranties under the Agreement applicable to such Account(s) and account debtors. In the event of any breach of any such warranty, the Buyer, its successors and assigns, shall have such rights, *inter alia*, as are provided in the Agreement.

The undersigned in his/her business capacity and PERSONALLY warrants and represents that, with respect to each Account, since the last sale of Accounts by the undersigned to the Buyer, no merchandise has been returned or rejected, no defense, dispute, claim, offset or counterclaim has developed or has been asserted with respect to any Account heretofore sold, transferred and assigned by the undersigned to the Buyer, which has not been or is not contemporaneously being reported in writing by the undersigned to the Buyer.

IN WITNESS WHEREOF, the undersigned has hereunto set its hand and seal this 8TH day of May, 2012

By: _____ Print Name: Scott Wilkosz Title: President
(Signature)

**EXHIBIT 4(m)**

## STATEMENT OF AUTHORIZED SIGNATURES FOR SALE/ASSIGNMENT OF ACCOUNTS

Gentlemen:

This is to advise you that the persons whose signatures appear below are hereby authorized to execute, on behalf of the undersigned corporation, any Schedule of Accounts Sold/Bill of Sale of accounts pursuant to the terms of the Sale of Accounts and Security Agreement between Briar Capital, LP and Forward Components Inc. dated as of May 8, 2012, and you are hereby authorized to accept the said signatures of such persons until such authorization is revoked in writing. Each of the persons below have been advised that the execution of the Schedule of Accounts Sold is a non-delegable duty and that each is deemed to have made the representations, warranties and covenants as provided in the Sale of Accounts and Security Agreement with each Schedule.

Very truly yours,

By: _____

Date: __May 8_____, 2012.

AUTHORIZED SIGNATURES:

__Scott Wilkosz_____
Typed or Printed Name

__Tammy Fayerweather_____
Typed or Printed Name

_____
Typed or Printed Name

_____
Signature

_____
Signature

_____
Signature

_____              _____
Typed or Printed Name                                    Signature

## EXHIBIT "4(e)"

## DISCLOSED LIENS

# 2017-24250 / Court: 270

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**12-7309612940**

**04/13/2012 15:40**

**FILED**
CALIFORNIA
SECRETARY OF STATE
SOS

32823180002  UCC 1 FILING

ILY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGEMENT TO:  (Name and Address)

Return acknowledgment to:

★

Capitol Corporate Services, Inc.
455 Capitol Mall Ste 217, Sacramento CA 95814
800/327-4842

1. DEBTOR'S EXACT FULL LEGAL NAME – Insert only one debtor name (1a or 1b) – do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Forward Components, Inc. | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 9740 Research Drive | Irvine | | CA | 92618 | USA |

| ADD'L INFO RE ORGANIZATION DEBTOR | 1d. TYPE OF ORGANIZATION | 1e. JURISDICTION OF ORGANIZATION | 1f. ORGANIZATIONAL ID#, if any | |
|---|---|---|---|---|
| | Corporation | CA | C3015493 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – Insert only one debtor name (2a or 2b) – do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |

| ADD'L INFO RE ORGANIZATION DEBTOR | 2d. TYPE OF ORGANIZATION | 2e. JURISDICTION OF ORGANIZATION | 2f. ORGANIZATIONAL ID#, if any | |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – Insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Brier Capital, L.P. | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
| 3c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 1500 City West, Suite 420 | Houston | | TX | 77042 | USA |

4. This FINANCING STATEMENT covers the following collateral:

All of Debtor's assets wherever located, whether now owned or hereafter acquired, and all proceeds thereof.

5. ALTERNATIVE DESIGNATION [if applicable]: ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

601172MV

FILING OFFICE COPY – NATIONAL UCC FINANCING STATEMENT (FORM UCC1) – CALIFORNIA (REV. 01/01/08)

EXHIBIT
C

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGEMENT TO: (Name and Address)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** – Insert only one debtor name (1a or 1b) – do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Forward Components, Inc. | | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 9740 Research Drive | Irvine | CA | 92618 | USA |

| ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID#, if any | |
|---|---|---|---|---|
| | Corporation | CA | C3015493 | ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** – insert only one debtor name (2a or 2b) – do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#, if any | |
|---|---|---|---|---|
| | | | | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Briar Capital, L.P. | | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1500 City West, Suite 420 | Houston | TX | 77042 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

All of Debtor's assets wherever located, whether now owned or hereafter acquired, and all proceeds thereof.

5. ALTERNATIVE DESIGNATION [if applicable]: ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable]
7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY – NATIONAL UCC FINANCING STATEMENT (FORM UCC1) – CALIFORNIA (REV. 01/01/08)

████████████████

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

CT Lien Solutions
Representation of filing

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| Phone: (800) 331-3282 Fax: (818) 662-4141 |

**This filing is Completed**
File Number : 1675489586
File Date   : 30-Sep-2016

B. E-MAIL CONTACT AT FILER (optional)
CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)   28609 - BRIAR CAPITAL

```
CT Lien Solutions          55893563
P.O. Box 29071
Glendale, CA  91209-9071   CALI
```

File with: Secretary of State, CA

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] |
| 127309612940   4/13/2012  SS CA | (or recorded) in the REAL ESTATE RECORDS Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☒ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:    **AND** Check one of these three boxes to:

This Change affects ☒ Debtor or ☐ Secured Party of record    ☒ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME |
| FORWARD COMPONENTS, INC. |

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME |
| FORWARD COMPONENTS, INC. |

OR

| 7b. INDIVIDUAL'S SURNAME |
| |
| INDIVIDUAL'S FIRST PERSONAL NAME |
| |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 20918 Bake Parkway, Suite 110 | Lake Forest | CA | 92630 | USA |

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME |
| Briar Capital, L.P. |

OR

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA: Debtor Name: FORWARD COMPONENTS, INC.
55893563          Forward Components                          Forward Components

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

Prepared by CT Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

The Agency Place                                                    Page 1 of 1

# 2017-24250 / Court: 270
**Claims Summary**
## The Hanover Insurance Group, Inc.
### Inquiry Date:  11/16/2016

Printer Friendly Version

Export To Excel

| | |
|---|---|
| **Producer Code** | 1606147 |
| **Producer Name** | FRED RHODES&COMPANY |
| **Date Range:** | 11162011  to  11162016   **To refine search enter new date range and select the New Inquiry button.** |
| | mmddyyyy    mmddyyyy |

New Inquiry

| | |
|---|---|
| **Insured Name:** | BRIAR CAPITAL, L.P. |
| **Customer Number** | 1027744584 |
| **Policy Number** | BFD   1045523 |
| **Policy Effective Date** | 12/20/2015 |
| **Premium Amount** | $8,530.00 |

| Claim Number | Date of Loss | Date Claim Reported | Desc of Loss | Paid Loss | Subro | Return To Work | Current Reserve | Claim Status | Notes Details |
|---|---|---|---|---|---|---|---|---|---|
| 0000035919 | 2016-11-02 | 11/16/2016 | fet | $.00 | Does_Not_Apply | | $.00 | open | NOTES |

| Adjuster Name | Phone # and Ext. | Fax # | Adjuster Skill | Adjuster Email Address |
|---|---|---|---|---|
| Johnson Ginger | 800-628-0250 x7603464 | 508-926-5660 | | gjohnson@hanover.com |

EXHIBIT
D



**Thank you. Your Webform was submitted successfully.**

   **(A copy of the completed form has been sent to the submitter)**

**Your confirmation number is**

## 486931520

Return

# 2017 PROOF OF LOSS: 270

2017 Proof of Loss: 270

| EACH STATEMENT MUST BE MADE UNDER OATH |

I.     Claim is hereby made this **2** day of **February** 20**16**, upon The Hanover Insurance Company ("Hanover") under Bond No. BFD1045523, issued for the period of December 20, 2015 to December 20, 2016 to Briar Capital LP for a loss sustained in the amount of $ **905,456.08**, consisting of money/property described in the schedule submitted below, which loss was discovered by us on the **2** day of **November**, 20**16**.

II.     The loss is a direct result of (check and complete):

     ☒   Insuring Agreement (A) - FIDELITY

     ☒   Insuring Agreement (B) - ON PREMISES

     ☒   Insuring Agreement (C) - IN TRANSIT

     ☒   Insuring Agreement (D) - FORGERY OR ALTERATION

     ☒   Insuring Agreement (E) – SECURITIES

     ☒   Insuring Agreement (F) - COUNTERFEIT CURRENCY

     ☒   Insuring Agreement Rider – VOICE INITIATED TRANSFER FRAUD

     ☒   Insuring Agreement Rider – TELEFACSIMILE TRANSFER FRAUD

**EXHIBIT E**

PROOF OF LOSS

      ☒  Insuring Agreement Rider – COMPUTER SYSTEMS FRAUD

                                                            _____

      ☒  Insuring Agreement Rider – AUDIT EXPENSE/FIDELITY CLAIMS EXPENSE

                                                              _____

**III.**    The loss occurred under the following circumstances (provide supporting documentation):

See attached.
_____

_____

_____

**IV.**    The loss was discovered under the following circumstances and by the following individuals (provide supporting documentation):

See attached.
_____

_____

**V.**    The loss consisted of property or money valued as itemized and described in the following schedule (if more space is required, continue on a separate sheet):

| Quantity | Description | *Approximate Date Purchased | *Place Purchased | *Actual Cost | Amount Claimed |
|---|---|---|---|---|---|
| | | | | | |

See attached.
_____

*If applicable

|  |  |
|---|---|
| Total | $ _____ |
| Less salary, commission, profit, etc. | $ _____ |
| Net Loss | $ 905,456.08 |

PROOF OF LOSS

**VI.**  The insured has no other insurance under which the above claim, or any part thereof, is claimable, except for the following:

**VII.**  Circumstances were reported to the police department or other law enforcement agency as follows:

| NAME OF AGENCY | LOCATION | REPORT NO. | DATE |
|---|---|---|---|
|  |  |  |  |

**VIII.**  The following property and/or cash has been recovered:

**IX.**  It is understood neither the delivery of this Proof of Loss nor any assistance rendered by Hanover's representative is either a waiver of Hanover's rights and defenses or an admission of liability. This form is provided solely to facilitate compliance with Proof of Loss filing requirements described within the Bond.

**X.**  The insured has caused these presents to be executed for the purpose of inducing Hanover to pay a claim as asserted and hereby assigns to and subrogates Hanover to all rights and causes of action the insured has against any person(s) or corporation(s) either arising out of or incident to said loss or damage to property on payment of this claim.

## PROOF OF LOSS

.................................................................

INSURED

By .............................................................

NAME AND TITLE OF OFFICER MAKING AFFIDAVIT

.................................................................

ADDRESS

Sworn to and subscribed before me ................................................................................................................................................................

(NOTARY PUBLIC OR COMMISSIONER OF DEEDS)

for the ................................................................... of .................................................................. this ................................. day of

COUNTY                                          STATE

........................................................ 20............ and in true testimony thereof I hereunto subscribe my name and affix my official seal the

day and year aforesaid.

.................................................................

SIGNATURE OF NOTARY PUBLIC OR COMMISSIONER OF DEEDS

4847-5075-9485, v. 1

(Page 4 of 4)

## PROOF OF LOSS STATEMENT AND SUPPORTING DOCUMENTATION

The loss suffered by Briar Capital, LLP ("Briar") is a direct result of a forged or altered negotiable instrument and is covered by Insuring Agreement (D), or an altered security agreement under Insuring Agreement (E). Forward Components, Inc. ("Forward") and Briar entered into that certain Sale of Accounts and Security Agreement (the "Agreement") dated May 8, 2012. To secure all payments owed to Briar, the Agreement granted Briar a security interest in Forward's Collateral. A true and correct copy of the Agreement is Exhibit A. The Agreement was signed by Scott Wilkosz as president of Forward.

Under the Agreement, Briar agreed to purchase from Forward certain accounts. The Accounts purchased by Briar from Forward constituted alleged invoices for purchases by several units and subsidiaries of Honeywell International, Inc. ("Honeywell"). Briar purchased the following forged and altered accounts from Forward:

| Date of Purchase | Account Debtor(s) | Schedule Number | Total Invoice Amount |
|---|---|---|---|
| March 7, 2016 | Honeywell (Torrance) and Honeywell (NM) | 337 | $126,875.00 |
| March 15, 2016 | Honeywell (MX) and Honeywell (NM) | 338 | $94,137.50 |
| March 16, 2016 | Honeywell (Paulin) and Honeywell (NM) | 339 | $108,136.25 |
| March 17, 2016 | Honeywell (Paulin) | 340 | $57,180.00 |
| March 21, 2016 | Honeywell (Paulin) | 341 | $54,080.00 |
| March 22, 2016 | Honeywell (Paulin) | 342 | $48,425.00 |
| April 18, 2016 | Honeywell (NM) | 343 | $48,631.00 |
| April 21, 2016 | Honeywell (AZ) and Honeywell (MX) | 344 | $77,080.00 |
| June 9, 2016 | Honeywell (AZ) and Honeywell (MX) | 345 | $89,609.00 |
| June 10, 2016 | Honeywell(MX) and Honeywell (Torrance) | 346 | $97,940.50 |
| June 10, 2016 | Honeywell (Torrance) | 347 | $28,200.00 |
| June 13, 2016 | Honeywell (Torrance) | 348 | $34,250.00 |
| June 14, 2016 | Honeywell (AZ) | 349 | $48,000.00 |
| June 15, 2016 | Honeywell (MX) | 350 | $47,500.00 |
| July 6, 2016 | Honeywell (AZ) and Honeywell (MX) | 351 | $149,624.00 |

A true and correct copy of the fraudulent Accounts, purchase orders, and invoices purchased from Forward is attached as Exhibit B. Scott Wilcosz's signature is on each of the Schedule of Accounts Sold/Bill of Sale documents. Briar was unaware that it was purchasing forged and altered accounts. On November 2, 2016, Scott Wilkosz admitted that Forward forged the purchase orders and sold Briar non-existent invoices. In total, Briar is owed the sum of $905,456.08.